*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0196P (6th Cir.)
File Name: 00a0196p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SALVADOR A. GAUDIANO,
*et al.*,
          *Petitioners-Appellants,*

          *v.*

COMMISSIONER OF INTERNAL
REVENUE,
          *Respondent-Appellee.*



No. 99-1294

On Appeal from the United States Tax Court.
Nos. 25712-96; 25713-96; 25714-96; 25716-96—
Juan F. Vasquez, Tax Court Judge.

Argued: December 17, 1999

Decided and Filed: June 8, 2000

Before: BOGGS and NORRIS, Circuit Judges; NUGENT,
District Judge.*

---

*The Honorable Donald C. Nugent, United States District Judge for
the Northern District of Ohio, sitting by designation.

testimony of a witness may "simply disregard it," the disregarded testimony is usually not considered sufficient grounds for drawing the opposite conclusion. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512, 104 S. Ct. 1949, 1966, 80 L. Ed.2d 502 (1984).

Absent the testimony of the Taxpayers regarding the alleged lack of consideration, the Guarantees appear on their faces to be valid and enforceable. Indeed the testimony of the Price Waterhouse auditor was compelling on that point. Accordingly, we do not find clear error in the Tax Court's finding that the Continuing Guaranty was valid and enforceable; and therefore, the Asher Taxpayers' bad debt deductions were properly disallowed.

### Conclusion

For the reasons stated herein, the Tax Court's disallowance of all of the deductions in dispute is AFFIRMED. Specifically, the Taxpayers were not entitled to deduct their suspended and ordinary losses for tax year 1993 because those losses were offset at the corporate level by the COD income realized by Four A. To the extent that COD income remains after exhausting the current and suspended losses of Four A (and its shareholders), such COD income passes through to the shareholders and increases their basis in their stock. In addition, the Asher Taxpayers were not entitled to a bad debt deduction because the debt was guaranteed by the valid and enforceable Guarantees of the Four A Taxpayers.

---

### COUNSEL

**ARGUED:** William C. Myers, Jr., WAGNER, MYERS & SANGER, Knoxville, Tennessee, for Appellants. Teresa E. McLaughlin, U.S. DEPARTMENT OF JUSTICE, APPELLATE SECTION TAX DIVISION, Washington, D.C., for Appellee. **ON BRIEF:** William C. Myers, Jr., Kathleen M. Flynn, WAGNER, MYERS & SANGER, Knoxville, Tennessee, for Appellants. Teresa E. McLaughlin, Edward T. Perelmuter, U.S. DEPARTMENT OF JUSTICE, APPELLATE SECTION TAX DIVISION, Washington, D.C., for Appellee.

---

### OPINION

---

NUGENT, District Judge. The Commissioner of Internal Revenue (hereinafter the "Commissioner") assessed tax deficiencies against Salvador A. and Kathleen M. Gaudiano, Randy C. and Kathleen R. Edgemon, Gary D. Asher, and Larry A. Asher (collectively the "Taxpayers") for the year 1993. The Commissioner determined that the Taxpayers had improperly utilized discharge of indebtedness income to increase their bases in the stock of their Subchapter S corporation Four A Coal Co.[1] Each Taxpayer then used the increase in basis to deduct certain losses. The Commissioner disallowed the deductions. In his answer to the Taxpayers' petitions in the Tax Court, the Commissioner asserted increased deficiencies against Taxpayers Gary Asher and Larry Asher for their *pro rata* share of a bad debt deduction taken by their Subchapter S corporation Appolo Fuels, Inc., for loans made to Four A Coal Co. After a trial, the United

---

[1]Kathleen M. Gaudiano and Kathleen R. Edgemon were not shareholders in Four A Coal Co. They are parties to these actions only because they filed joint tax returns with their husbands.

by Mr. Gaudiano or Appolo to include the consideration language in the Guarantees; and Mr. McGowan, the Price Waterhouse auditor, "who corroborated the Taxpayers' testimony that Appolo never made promises to the Four A shareholders regarding future advances or collection forbearance and that the Guaranties were respectively backdated to January 1, 1989, and April 30, 1990, to give the appearance of enforceability." Appellant's Opening Brief at p. 56. Taxpayers also argue that with Four A hopelessly insolvent, any threat to foreclose on Four A's debt by Appolo would have been meaningless.

The Commissioner counters that Appolo's promise to forbear from suit was not meaningless for two reasons. First, Four A possessed sufficient assets to satisfy at least some of its indebtedness to Appolo at the time the Continuing Guaranty was executed. Second, the Guarantees resulted in a better financial statement for Appolo, from which the Ashers could benefit.

Moreover, upon review of the record, the non-taxpayer testimony of Mr. Stites and Mr. McGowan did not do much to corroborate the Taxpayers' testimony. Rather, the testimony simply informed the Court that Mr. Stites and Mr. McGowan had no idea whether a promise was made or not. Indeed, Mr. McGowan testified that he believed that the Guarantees were valid and that he would not have accepted them if he believed that they were not valid.

Considering the Tax Court's ability to assess the demeanor of the witnesses and the credibility of the testimony provided by the witnesses, and the reasons why the Asher Taxpayers might have had motive to provide the Guarantees, we cannot find that the Tax Court clearly erred in disregarding the Taxpayers' testimony. A trial court's findings based on determinations regarding the credibility of witnesses are generally entitled to great deference. *See Owens-Illinois, Inc. v. Aetna Cas. & Sur. Co.*, 990 F.2d 865, 870 (6th Cir. 1993); *In re H.J. Scheirich Co.*, 982 F.2d 945, 949 (6th Cir. 1993). Moreover, while a factfinder who does not believe the

States Tax Court upheld all of the Commissioner's deficiency determinations. The Taxpayers filed this timely appeal.[2] We exercise jurisdiction pursuant to 26 U.S.C. § 7482(a)(1) and AFFIRM for the reasons stated below.

## Procedural and Factual Background

### I. Discharge of Indebtedness Income

During 1993, and relevant prior years, Taxpayers Salvador Gaudiano, Gary Asher, Larry Asher, and Randy Edgemon were each 25% shareholders of Four A Coal Co. (hereinafter "Four A"), a Kentucky corporation electing to be taxed under Subchapter S of the Internal Revenue Code (26 U.S.C. §§ 1361 through 1379). Until February of 1991, Four A engaged in the business of underground coal mining and operated as a contract miner for another Subchapter S corporation, Appolo Fuels, Inc. (hereinafter "Appolo"). Taxpayers Gary D. Asher and Larry A. Asher were 24% shareholders in Appolo.

In January, 1993, Four A filed for protection under Chapter 7 of the Bankruptcy Code and was insolvent within the meaning of 26 U.S.C. § 108(d)(3). As a result of the bankruptcy, Appolo wrote off as bad debt the loans it had made to Four A. Thus, Four A realized $1,289,048 in discharge of indebtedness income, also known as cancellation of debt income (hereinafter "COD" income). While gross income generally includes income from the discharge of indebtedness[3], §108 (a)(1)(B) provides an exclusion of discharge of indebtedness income from gross income when the taxpayer is insolvent. Pursuant to 26 U.S.C. § 108

---

[2] The Taxpayers do not appeal the Tax Court's determination regarding the Taxpayers' claims for refund for their distributive shares of the increased § 1231 loss claimed by Four A in an amended Form 1120S which reported the amount realized on the sale of mining equipment as $145,430 instead of $445,000 as previously reported in 1993.

[3] See 26 U.S.C. § 61 (a)(12).

(d)(7)(A), the exclusion is determined at the S corporation level (not the shareholder level) in cases of discharge of S corporation indebtedness. The exclusion applied to Four A's discharge of indebtedness income. Thus, Four A's discharge of indebtedness income was excluded from gross income because Four A was insolvent when the debt was discharged.

Relying on the pass through and basis adjustment provisions applicable to Subchapter S corporations in 26 U.S.C. §§ 1366 and 1367, the Taxpayers increased their respective bases in the stock of Four A by $322,262, representing a 25% share of the discharge of indebtedness income[4]. Each Taxpayer then used the increase in basis to deduct suspended losses from prior tax years as well as ordinary losses from 1993 which would not have been deductible without the increase in the shareholders' bases. Upon audit, the Commissioner determined that the Taxpayers were not entitled to increase their adjusted bases in the stock of Four A by their *pro rata* shares of the excluded discharge of indebtedness income. Therefore, the Commissioner denied the loss deductions claimed by the Taxpayers as a result of the upward basis adjustments and assessed the deficiencies at issue here. Taxpayers filed Tax Court petitions contesting the deficiency determinations.

## II. Disallowance of Appolo Bad Debt Deduction

Appolo is an S corporation which began as a surface mining operation but changed to a coal processing and coal sales company by 1988. Taxpayers Larry Asher and Gary Asher were 24% shareholders of Appolo. Appolo purchased

---

[4] 26 U.S.C. § 1366(a)(1) provides that, in determining an S corporation shareholder's tax liability, "there shall be taken into account the shareholder's pro rata share of the corporation's–
   (A) items of income (including tax-exempt income) . . . the separate treatment of which could affect the liability for tax of any shareholder . . . ."
26 U.S.C. § 1367(a)(1)(A) provides that "the basis of each shareholder's stock in an S corporation shall be increased . . . by . . . (A) the items of income described in subparagraph (A) of section 1366(a)(1)."

promised to forbear suing Four A on Four A's past debt, Appolo never actually made such a promise. The Tax Court noted that the only evidence submitted to disprove the existence of Appolo's promise was "their own self- serving testimony," which the Court, citing *Tokarski v. Commissioner*, 87 T.C. 74 (1986), declined to accept.

The Asher Taxpayers contend that the Tax Court improperly ignored their evidence demonstrating that the Guarantees lacked valid consideration. They maintain that "it is inconceivable that Four A's shareholders would have put their personal assets on the line in exchange for Appolo's collection forbearance of Appolo's future advances to Four A." The Asher Taxpayers assert that *Tokarski*, and the line of cases cited therein, which stand for the proposition that the court need not accept a petitioner's self-serving testimony when it is uncorroborated and inconsistent with other facts and circumstances presented at trial, is distinguishable from the facts in this case.

In *Tokarski*, a taxpayer and his mother testified that a bank deposit by the taxpayer was an inheritance from his father, not income from working. The taxpayer testified that he had never worked and that he received funds to live on from his uncles. The court found it incredible that the taxpayer, who appeared to be a normal, healthy, 32-year old, had never been productively employed. The court noted that it weighed against the taxpayer that he did not offer any corroborative testimony from his uncles or offer any explanation for not doing so. The court also questioned the taxpayer's proffered reason for waiting 6 weeks to deposit the money. "Under all the circumstances," the court held, "we are not required to accept the self-serving testimony of petitioner or that of his mother as gospel." *Tokarski,* 87 T.C. at 77.

The Taxpayers argue that, unlike the situation in *Tokarski*, the testimony of each Taxpayer was internally consistent with and corroborated by the other Taxpayers' testimony. They also point to the testimony of non-taxpayers, Mr. Stites, Appolo's legal counsel, who testified that he was not directed

to the shareholders pursuant to §1366 and increase the shareholder's basis pursuant to §1367. The shareholder may then use his increased basis to deduct any losses that may accumulate in the future.

In this case Four A realized $1,289,048 in COD income. Each shareholder deducted $309,914 in suspended and ordinary losses. The shareholders' combined losses ($1,239,656) are completely offset by the $1,289,048 in COD income. Accordingly, the losses were not available to the Taxpayers to use as deductions on their 1993 returns and the Tax Court's disallowance of the deductions is affirmed.[9]

## II.  Bad Debt Deduction

The Tax Court held that Appolo was not entitled to a bad debt deduction under § 166 for amounts advanced to Four A because the debt was guaranteed by Four A's shareholders and the Guarantees were enforceable under Kentucky law. The Taxpayers contend that the Guarantees were invalid and unenforceable due to lack of consideration. The question of whether a contract lacks consideration is a fact question, subject to review for clear error.  See *Prichard v. Bank Josephine*, 723 S.W.2d 883, 886 (Ky. Ct. App. 1987); *Roach v. United States*, 106 F.3d 720, 723 (6th Cir. 1997).

The Tax Court found that the first guaranty, the "Continuing Guaranty," stated that Appolo promised to forbear suing Four A on Four A's past debt; thus, the Continuing Guaranty was supported by adequate and sufficient consideration and is enforceable. Further, the Court found that the Four A shareholders were financially capable of satisfying the Guarantees. The Asher Taxpayers argued that while the Continuing Guaranty recites that Appolo

---

[9]Because the Taxpayers' losses were less than the amount of COD income realized by Four A, each taxpayer is entitled to increase the basis of their stock by their share of the excess COD income. Since Four A is no longer operating, however, it is unlikely that the corporation will incur future losses.

coal from Four A. Between the years 1988 and 1991, Appolo advanced large sums of money to Four A. Four A ceased mining operations in February of 1991. In March, 1991, Price Waterhouse LLP audited Appolo's 1990 financial statements. During that audit Price Waterhouse questioned the collectibility of the Four A debt and raised the question of whether a bad debt reserve should be established on Appolo's books. Appolo, through its chief financial officer Taxpayer Salvadore Gaudiano, asserted that the debt was collectible and presented a repayment plan developed by the Four A shareholders to repay the debt to Appolo over eight years from equipment rental fees, the residual value of the Four A mining equipment, and Taxpayer loans to Four A.

Price Waterhouse reviewed the repayment plan and determined that the loans should have some sort of personal guarantee of the shareholders.  Mr. Gaudiano and Price Waterhouse agreed that the Four A Taxpayers would execute guarantees to Appolo for the Four A debt and that Appolo would not be required to establish a reserve against the Four A debt. On or about May 13, 1991, the Taxpayers executed two guaranty agreements (collectively, the Guarantees). The first guaranty, which is titled "Continuing Guaranty", was backdated to January of 1989. The Continuing Guaranty provides in relevant part:

> [Appolo] has from time to time loaned money to Four A on a demand basis, some of which loans remain outstanding . . . . [T]he guarantors desire to grant this Guaranty to Appolo as consideration for Appolo not demanding immediate payment of its existing loans to Four A, and as an inducement to Appolo to make future advances to Four A, without which Guaranty Appolo would not take such action; . . . Therefore, . . . in exchange for good and valuable consideration, the receipt and sufficiency of which all the Guarantors hereby acknowledge, the Guarantors do hereby absolutely, unconditionally and irrevocably guaranty to Appolo . . . [t]he repayment in full (without interest) of all loans and advances made by Appolo to Four A, including both

those currently outstanding and those made in the future.
. . .

(Joint Ex. 19-s, JA 356-58). The Continuing Guaranty further states: "Each of the Guarantors expressly agrees that neither the bankruptcy, insolvancy [sic], reorganization, liquidation, dissolution, death or disability of any or all of Four A and the other Guarantors shall diminish, impair, discharge or release, or otherwise affect, the obligations and liability of the Guarantor under this Guaranty. . . ." *Id.* at JA 357.

The second Guaranty, backdated to April 30, 1990, guarantees two loans from Appolo to Four A in the amounts of $500,000 and $170,000. The Guaranty states that "the Guarantors have previously agreed to guarantee the First Note and the Guarantors desire to guarantee the Second Note as an inducement to Appolo to make the loan evidenced thereby, without which guarantee Appolo would not take such action". (Joint Ex. 20-t, JA 359). As in the Continuing Guaranty, the second Guaranty asserts that the Guaranty is provided in exchange for "good and valuable consideration, the receipt and sufficiency of which all the Guarantors hereby acknowledge" and that "neither the bankruptcy, insolvancy [sic], reorganization, liquidation, dissolution, death or disability of any or all of Four A and the other Guarantors shall diminish, impair, discharge or release, or otherwise affect, the obligations and liability of the Guarantor under this Guaranty". *Id*. at JA 360.

Four A filed a petition for relief under Chapter 7 of the Bankruptcy Code in December, 1993. At the time of its bankruptcy filing, Four A owed $1,106,000 to Appolo. Appolo determined that the Four A debt was "worthless" and deducted the $1,106,000 Four A debt as a business bad debt pursuant to 26 U.S.C. §166 (a) on its 1993 Form 1120S, U.S. Income Tax Return for an S Corporation. Appolo never demanded payment from Four A or any of its shareholders. Taxpayers Larry Asher and Gary Asher, as Appolo shareholders, each reported an ordinary loss of $80,246 on

shareholder losses) would never occur since there would be no income left at the corporate level to apply against the losses. While § 108(b)(4)(A) provides that the reduction in attributes shall be made after the determination of the tax imposed by this chapter for the taxable year of the discharge, it does not preclude the reduction of certain attributes in the year of discharge. Specifically, § 108(b)(4)(B) provides that reductions of net operating loss for the taxable year of discharge and any net operating loss carryover and any capital loss carryover shall be made "first in the loss for the taxable year of discharge." Thus, the corporation must determine its net operating losses and suspended operating losses for the year of discharge and reduce those attributes by the amount of COD income realized. If the losses exceed the COD income, then the extra losses pass through to the shareholders.

We disagree with the Tax Court and the Tenth Circuit in their findings that COD income is not income within the meaning of § 1366(a)(1)(A) and thus does not pass through to the shareholders and increase the basis of their shares. Section 1366 (a)(1)(A) explicitly includes tax-exempt income. The Tax Court and the Tenth Circuit have determined that COD income is not really tax-exempt since COD income reduces suspended losses and thus operates to defer rather than eliminate taxes. However, as Judge Posner explained in *Witzel*, COD income is not always tax deferred; it may be truly tax exempt if there are no suspended losses to offset the income. Moreover, § 1366 is not "limited to tax-exempt income, so if COD income is not 'really' tax exempt this would not take it out of the section." *Witzel*, 200 F.3d at 505.

Since COD income falls within § 1366(a)(1)(A), it follows that pursuant to § 1367(a)(1)(A), COD income increases the basis of the S corporation shareholder's stock by the amount of COD income passed through to the shareholder. Consequently, we hold that the S corporation must reduce any existing tax attributes, including shareholder suspended losses, by the amount of COD income realized by the S corporation. If any COD income remains after losses and suspended losses are deducted, that income may flow through

§108(d)(7)(A), tax attributes [*sic*] reductions must be applied at the corporate level with subchapter S corporations. Taxpayers' proposal would not give effect to the attribute reduction scheme. Taxpayers' approach, in fact, would thwart the purpose of the net operating loss tax attribute. . . . As we see it, §108(b)(4)(A) is simply designed to compute certain tax applications ... before reducing tax attributes. We do not read the statute as mandating that attribute reductions be made in the tax year following the year of the discharge. We concede that, if §108(b)(4)(A) is read narrowly and in isolation, it is plausible to conclude Congress intended tax attributes to be reduced only in the tax year following the taxable year of the discharge. But we must read the Internal Revenue Code as a whole. . . . Taxpayers' interpretation of §108(b)(4)(A) would negate the effect of the tax attribution scheme and would give taxpayers an unwarranted windfall.

*Gitlitz*, 182 F.3d at 1149. In *Witzel*, without specifically addressing the ordering requirements of § 108(b)(4)(A), the Seventh Circuit determined that the tax attributes must be reduced before COD income passes through: "if (b)[§108(b)] is to be applied at the corporate level, the implication . . . is that the excluded income must be set off against the suspended losses and the latter reduced accordingly. The argument is not conclusive; the interpretive question could be resolved either way; but in these circumstances of dubiety the sensible result--denying the taxpayers the double windfall-- seems to us the preferable one." *Witzel,* 200 F.3d at 503-04.

While this is a very close call, we feel inclined to follow the reasoning of the Tenth and Seventh Circuits on the ordering issue. Section 108 (d)(7)(A) clearly requires that the insolvency determination and the attribute reduction take place at the corporate level. If the attribute reduction is made after the COD income passes through then there will be no attribute reduction at the corporate level. As the Commissioner notes, the mandated reduction of the corporation's net operating losses (which include suspended

their individual 1993 tax returns based on their distributive shares of Appolo's bad debt write-off.

The Commissioner did not disallow the loss deductions claimed by the Ashers upon audit. Rather, in his answer in the Larry Asher case, and in an amendment to his answer in the Gary Asher case, the Commissioner asserted that Appolo was not entitled to a bad debt deduction for the amounts owed by Four A because those debts were not worthless in 1993 in that the debts were guaranteed by the Four A shareholders who were financially able to make full payment on Four A's debts to Appolo. Consequently, the Commissioner requested that the Tax Court determine that the Ashers were liable for increased deficiencies for 1993.

The Ashers opposed the Commissioner's requests for increased deficiencies, contending that the Guarantees were not given in exchange for consideration, and thus, were not enforceable under Kentucky law. During a brief trial before the Tax Court, the Taxpayers offered testimony that they were told the Guarantees were for the auditors and that Appolo never demanded that the Guarantees be executed. Further, the Taxpayers testified that it was understood by Appolo and the Taxpayers that Appolo did not require and would never enforce the Guarantees; the Guarantees were executed solely to appease the Price Waterhouse auditor. The Taxpayers asserted that the Guarantees were given to the auditor and that no copies were kept by the Taxpayers or Appolo. Moreover, the Taxpayers contended that the consideration language in the Guarantees was merely form language added by Appolo's legal counsel John Stites which Appolo had not requested. Finally, the Taxpayers testified that Appolo had never promised to forbear from suing Four A on Four A's past debt.

The Tax Court held that Appolo was not entitled to a bad debt deduction for the amounts loaned to Four A; and thus, the Ashers were not entitled to the ordinary losses they claimed as their distributive share of Appolo's deduction. The Tax Court's decision was based on its observation that the Guarantees appeared valid and enforceable on their faces.

The Tax Court focused on the first Continuing Guaranty, which stated on its face that consideration was given to the Four A shareholders in that Appolo promised not to demand immediate payment on past loans to Four A and to make future loans to Four A. Noting that forbearance to sue is sufficient consideration to support a promise, the Tax Court found that the first Guaranty was supported by sufficient consideration and held that the Guaranty was valid and enforceable. In making this finding the Tax Court did not accept the self-serving testimony of the Taxpayers offered to prove that Appolo did not give consideration for the Guarantees. The Tax Court also found that the Taxpayers were financially able, both in 1993 and at the time of the trial, to satisfy Four A's debts to Appolo. Consequently, the Tax Court concluded that since the first Continuing Guaranty is enforceable, the debt was not worthless, regardless of whether the second Guaranty is enforceable.

## Analysis

### I. Pass Through Issue

The initial issue in this case raises a question of first impression in this Circuit. Whether the Taxpayers, as the shareholders of Four A, an S corporation, are entitled to increase their bases in the stock of Four A by their *pro rata* share of discharge of indebtedness income ("COD income") realized by Four A, but excluded by Four A pursuant to 26 U.S.C. §108(a)?

There are no facts in dispute, thus the Tax Court's decision on this legal issue is a question of law that is reviewed *de novo*. *Estate of Mueller v. Commissioner*, 153 F.3d 302, 304 (6th Cir. 1998).

### A. The Tax Court Decision

The Tax Court held that the COD income that Four A excluded from gross income under § 108 (a) is not a separately stated item of tax-exempt income for purposes of § 1366 (a)(1)(A). Therefore, Taxpayers were not entitled to

excluded from gross income under § 108(a)(1)(B) shall not exceed the amount by which the taxpayer is insolvent. § 108(a)(3). Further, the amount of COD income excluded under § 108(a)(1)(B) shall be applied to reduce the tax attributes of the taxpayer in the order listed in § 108(b)(2) [Net operating loss, general business credit, minimum tax credit, capital loss carryovers, basis reduction, Passive activity loss and credit carryovers, and foreign tax credit carryovers]. § 108(b)(1). Section 108(b)(4) provides that the reductions described in § 108(b)(2) shall be made after the determination of the tax imposed by this chapter for the taxable year of the discharge. Section 108(d)(7) contains special rules for S corporations. Section 108(d)(7)(A) provides that in the case of an S corporation, subsections (a) [exclusion of COD income if taxpayer is insolvent or is in Title 11], (b) [reduction of tax attributes] and (g) [qualified farm indebtedness] shall be applied at the corporate level.

As the Tenth Circuit recognized in *Gitlitz*, the timing of the attribute reduction brings § 108(b)(4)(A) into conflict with § 108(d)(7)(A). Under the Taxpayers' position, excluded COD income does not reduce S corporation losses as required by § 108(b)'s attribute reduction requirement if the reduction is made in the year following the year of discharge. Rather, current and suspended losses are deducted by the shareholders by virtue of their increased basis, thus offsetting other income the shareholders may have. In practice, there would be no income left to offset any tax attributes at the corporate level in the year following discharge.

The Commissioner argues that § 108(b)(4)(A) does not require that the reduction of tax attributes be made in the year following the year of discharge. *See* § 108(b)(4)(B) (reductions under § 108(b)(2)(A) & (D)[net operating loss and capital loss carryover] shall be made first in the loss for the taxable year of the discharge.) Faced with the same argument from the taxpayers in *Gitlitz*, the Tenth Circuit held:

Although a close question, we ultimately conclude the taxpayers' theory is not compelling. According to

losses were completely offset by the amount of the COD income), the increased basis may enable the taxpayer to deduct future losses.[8] *Id.* at 505.

## C. The Parties' Arguments

The parties in this case raise the same arguments made by the parties in *Gitlitz*, *Farley*, *Witzel*, and *Hogue*. The Commissioner argues that the only reasonable interpretation of § 108 is that COD income is recognized only at the corporate level, does not pass through to the shareholder, does not raise the shareholder's basis and instead eliminates suspended losses at the corporate level. Taxpayers argue that § 108(d)(7)(A)-(C) does not override or vary the general S corporation pass through and basis provisions set forth in §§ 1366 and 1367, nor does § 108(d)(7)(A) preclude pass through of COD income under § 1366(a)(1)(A).

As the conflicting decisions of the other courts which have analyzed this issue demonstrate, interpreting the Internal Revenue Code is about as easy as swimming through mud. The sections at issue, 108, 1366, and 1367, while seemingly clear on their faces, become muddy when they are applied in conjunction with each other.

The analysis begins with § 108(a)(1)(B) which provides that gross income does not include any amount which would be includible in gross income by reason of the discharge of indebtedness of the taxpayer if the discharge occurs when the taxpayer is insolvent. In this case the parties agree that Four A was insolvent at the time that its debt to Appolo (approximately $2 million) was discharged. The amount

---

[8]Presumably, the shareholder's basis in his S corporation stock would only increase by the amount of the COD income which was not offset by the existing suspended losses. Thus, the S corporation had $5.4 million in excluded COD income which was offset by approximately $3 million in existing suspended losses leaving approximately $2.4 million in COD income to pass through to the shareholder to increase the shareholder's basis.

---

increase their bases in the Four A stock due to Four A's COD income. In reaching this decision, the Tax Court relied, with little discussion, on its reviewed decision in *Nelson v. Commissioner*, 110 T.C. 114 (1998), *aff'd,* 182 F.3d 1152 (10th Cir. 1999).

In *Nelson*, the Tax Court held that a taxpayer was not entitled to increase the basis in his S corporation stock by his *pro rata* share of the insolvent corporations's COD income. The *Nelson* court set out the arguments as follows:

The parties' dispute herein centers on the language in section 108 (d)(7)(A). Specifically, the parties differ on the precise meaning of the phrase, "in the case of an S corporation, * * * [section 108] shall be applied at the corporate level." Sec. 108(d)(7)(A). [The Commissioner] argues that section 108(d)(7)(A) represents an adjustment and/or exception to the principles underlying the subchapter provisions that items of income realized or recognized at the corporate level are passed through to the shareholders. On the other hand, [Taxpayer] contends that section 108(d)(7)(A) stands for the proposition that prior to the determination of an individual shareholder's income tax liability, the S corporation must be ascertained to be insolvent.

[The Taxpayer], in effect, argues that the result of the interaction between section 108(d)(7)(B) and (b)(2), as governed by section 108(b)(4), is to apply the attribute reduction rules of section 108(b)(2) at the shareholder level. Section 108(b)(4) states that the reduction in tax attributes will be made "after the determination of the tax imposed * * * for the taxable year of the discharge." (Emphasis added.) Next, [Taxpayer] points out that "suspended losses" under section 1366(d)(i)-(3) are deemed to be net operating losses. Sec. 108(b)(2). Such "suspended losses" are determined at the shareholder level. Sec. 1366(d)(1). Consequently, [Taxpayer] extrapolates that the reduction in tax attributes occurs on

the shareholder level. Similarly, [Taxpayer] reasons that COD income excluded under section 108(a)(1) passes through to the shareholder, increases his or her stock basis, and thus affects his or her "suspended losses" under section 1366(d). According to [Taxpayer], all of this occurs at the shareholder level, prior to the reduction in tax attributes under section 108(b)(2).

Accordingly, in order for [Taxpayer] to prevail in this matter, the COD income otherwise excluded from gross income must pass through the corporate form and be apportioned on a pro rata basis among the subchapter shareholders. We disagree with [Taxpayer]'s statutory approach with respect to the COD income exclusion provision because it is simply not plausible. In this instance, section 108(d)(7)(A) explicitly provides that the COD income exclusion operates, for purposes of the subchapter S regime, on the corporate level.

*Nelson*, 110 T.C. at 120-21. The court held that the literal language of §108(d)(7)(A) provides that the reduction in tax attributes applies at the corporate level. *Id*. at 121. Further, § 1366(b) provides that the character of any item included under § 1366(a)(1)(A) is determined as if realized directly from the source from which realized by the corporation, or incurred in the same manner as incurred by the corporation. Thus, the court determined that construing § 1366(a)(1)(A) in combination with § 108(d)(7)(A) meant that COD income was precluded from recognition at the shareholder level and could not, therefore, increase the shareholder's basis. *Id*. at 122.

In addition, the Tax Court held that § 108(b)(4)(A), which states that the reduction of tax attributes occurs after the determination of the tax imposed for the taxable year of the discharge, requires the S corporation to reduce its tax attributes by the amount excluded from gross income at the end of the corporation's taxable year. *Id*. at 123. The court rejected taxpayer's argument that the income was "tax exempt" and thus statutorily required to pass through to S

section 108(d)(7)(A) requires that COD income of a subchapter S corporation be offset against any existing suspended losses arising from the operation of the corporation." *Id*. at 506. Thus, the taxpayer in *Witzel* was forbidden to deduct his existing suspended losses because they were offset at the corporate level by the amount of his corporation's COD income.[6] The Seventh Circuit noted that resolving the interpretive question in this way, which denies the taxpayers the double windfall, seemed to be preferable. *Id*. at 504. While Judge Posner did not specifically address the timing of the attribute reduction as set forth in §108(b)(4), his holding indicates that he sided with the *Gitlitz* Court in finding that attribute reduction precedes pass through.

However, in contrast to *Gitlitz*, Judge Posner determined that COD income passes through to the shareholder pursuant to § 1366(a)(1)(A), which explicitly includes tax exempt income, and increases the basis of the shareholder's stock pursuant to § 1367. The Court was unpersuaded by the Tax Court's conclusion that COD income is merely tax deferred, not really tax exempt, noting that there could be occasions when COD income is truly tax exempt as opposed to merely tax deferred. In any event, Judge Posner noted that § 1366 is not limited to tax-exempt income, so even if COD income really was not tax exempt it would not take it out of § 1366.[7] Thus, while the taxpayer cannot use his increased basis to deduct existing suspended losses (because in *Witzel* those

---

[6]Mr. Witzel was the sole shareholder of an S corporation with $5.4 million of COD income and suspended losses of almost $3 million.

[7]The court noted a recent Treasury Regulation which supports the Commissioner's and the Tax Court's interpretation of § 1366, but declined to follow the regulation since it is only applicable to tax years beginning on or after August 18, 1998. The regulation states "'Tax-exempt income' does not include income from discharge of indebtedness excluded from income under section 108 because such income is not permanently excludible from income in all circumstances in which section 108 applies." Treas. Reg. §1.1366-1(a)(2)(viii), 64 Fed. Reg. 71641, 71643 (Dec. 22, 1999). Similarly, this regulation does not apply here because the tax year at issue is 1993.

S corporation shareholders. The court determined that once COD income is excluded from gross income pursuant to § 108(a)(1), it is treated as tax-exempt income pursuant to § 1366(a)(1) and is passed through to S corporation shareholders under that section. Pursuant to § 108(b)(2), the amount of COD income excluded from gross income is applied to reduce tax attributes. That reduction of tax attributes is made after the determination of the tax imposed by this chapter for the taxable year of the discharge. § 108(b)(4)(A). Thus, the court concluded that COD income passes through to S corporation shareholders in the year that the debt is discharged and the tax attributes are decreased in the year following the discharge because the determination of the tax imposed for the tax year in which the discharge occurred cannot take place until that tax year ends. *Id.* at *2-3. As a result, the S corporation shareholders in *Hogue* were allowed to increase shareholder basis in the year of the discharge and claim suspended losses against the increased basis. The attribute reduction mandated by § 108(b)(2) would occur in the year following the year of discharge. The court, noting that the Tenth Circuit's decision in *Gitlitz* was driven by the court's desire to avoid allowing the taxpayers to realize a windfall, stated that "[t]he Internal Revenue Code is too complicated for courts to strain against the language in an effort to achieve particular results." *Id.* at *3.

Chief Judge Posner, writing for the Seventh Circuit, addressed this issue in *Witzel v. Commissioner of Internal Revenue*, 200 F.3d 496 (7th Cir. 2000), and settled on a result somewhere in the middle between the Tenth Circuit's position in *Gitlitz* and the positions of the Third Circuit in *Farley* and the District Court of Oregon in *Hogue*. The Seventh Circuit noted that while the "at the corporate level" language of §108(d)(7)(A) was not susceptible to conclusive interpretation, "[i]f (b) [the subsection that reduces tax attributes by the amount of the excluded COD income] is to be applied at the corporate level, the implication, as the government argues, is that the excluded income must be set off against the suspended losses and the latter reduced accordingly." *Id.* at 503-04. Thus, the Court held "that

corporation shareholders under § 1366(a)(1)(A). Instead, the court noted that the exclusion could be subject to taxation in the future, and therefore was not necessarily tax exempt on a permanent basis. *Id.* at 125. After reviewing the "relatively sparse legislative history," the court also observed that allowing taxpayer to increase his basis by using income for which the creditors, not taxpayer, had borne an economic cost would produce an unintended windfall for taxpayer. *Id.* at 127-28.

**B.    Decisions of other courts on the COD pass through issue.**

In July 1999, the Tenth Circuit, the first circuit to rule on this issue, affirmed the *Nelson* decision for the reasons stated in *Gitlitz v. Commissioner of Internal Revenue*, 182 F.3d 1143 (10th Cir. 1999). The Tenth Circuit determined that:

> The outcome of this case is ultimately determined by the timing of the pass-through. If the attribute reduction procedures precede the pass-through, the corporation's excluded discharge of indebtedness income is absorbed before it can pass through to shareholders and compel basis adjustments. Potential windfalls are thus avoided. If, on the other hand, attribute reduction takes place after the pass-through, the taxpayers' theory must prevail.

*Id.* at 1148. The court concluded that attribute reduction must precede the pass through. In reaching this conclusion the court reviewed § 108(d)(7)(B) which provides that, in administering the tax attribute reduction scheme, shareholder losses suspended pursuant to § 1366(d)(1) must be treated as net operating losses for purposes of § 108(b)(2)(A), "thereby precluding subchapter S corporation shareholders with carryover losses from enjoying the tax benefits of ordinary losses while simultaneously avoiding taxation on discharge of indebtedness income." *Id.* The Court interpreted § 108(d)(7)(B) as requiring that shareholder suspended losses be added to the corporation's annual net operating losses in applying the net operating loss tax attribute reduction. The court conceded that since a subchapter S corporation's losses

are normally deductible only by its shareholders, the corporation itself is not permitted to take a net operating loss deduction. However, the court noted, "nothing in the Internal Revenue Code mandates that corporate net operating losses pass through immediately to shareholders. If pass through was immediate, "shareholders could secure a windfall by (1) avoiding tax on corporate discharge of indebtedness income under § 108(a), and (2) employing the corporation's passed-through net operating losses to reduce their own non-corporate related gross income without having first decreased the net operating losses by the amount of the corporation's discharged debt." *Id.*

The Tenth Circuit concluded that "when § 108(a)'s discharge of indebtedness income exclusion is triggered, a shareholder's pro rata share of the corporation's net operating losses passes through to him only to the extent such losses are not absorbed by the shareholder's pro rata share of the excluded canceled debt." *Id.* Further, should any debt discharge amount remain after the tax attributes are reduced, it is disregarded and has no tax consequences; it does not increase the shareholder's basis.[5]

Two other circuit courts and one district court have also recently addressed this issue and have come to different conclusions. In *United States v. Farley*, No. 99-3209, 2000 WL 72087 (3rd Cir. Jan. 27, 2000), the taxpayers obtained refunds after adjusting the basis of their S corporation stock upward to account for excluded COD income. By increasing

---

[5]The Tenth Circuit set out examples which show how their interpretation of the interplay between §§ 108 and 1366-1368 operates in practice. The steps which need to be taken in each calculation are: 1) corporation computes its COD income and sets this figure aside temporarily; 2) corporation calculates its net operating loss tax attribute (net operating loss + shareholder suspended losses); 3) corporation applies the excluded COD income to reduce its tax attributes. After these calculations are complete, if any COD income remains it is ignored and has no tax consequences. If any net operating losses or suspended losses remain, they flow through to the shareholder and, depending on his basis, may be used by him to offset his own gross income. 182 F.3d at 1150 n.6.

the basis of their stock, the taxpayers were able to deduct previously suspended losses. The Court noted that the key to unraveling the case was determining how sections 1366, 1367, and 108 interact. As in *Gitlitz*, the Third Circuit noted that the timing of the pass through, which is controlled by § 108(b)(4)(A), determines the outcome of the case. Unlike the Tenth Circuit in *Gitlitz*, the Third Circuit held that:

"[t]he language in section 108(b)(4)(A) clearly indicates that tax attributes are reduced on the first day of the tax year *following* the year of the discharge of indebtedness. The statutory language is straight forward. Discharge of indebtedness income, considered income under section 61(a)(12), is excluded from gross income pursuant to section 108(a)(1)(B) if, as in this case, the S corporation is insolvent. This solvency determination is made at the corporate level rather than the individual shareholder level pursuant to section 108(d)(7)(A). Discharge of indebtedness income excluded from gross income under section 108(a)(1)(B) then passes through to the S corporation's shareholders pursuant to section 1366(a)(1)(A). Upon passing through to the S corporation's shareholders, the discharge of indebtedness income causes an upward adjustment in the basis of the shareholder' S corporation stock pursuant to section 1367(a)(1)(A), thus allowing deductions for losses previously suspended because the corporation's stock lacked adequate basis. Finally, the tax attribute reduction required by section 108(b) takes place on the first day of the tax year following the year of the discharge of indebtedness, as mandated by section 108(b)(4)(A)."

*Farley*, 2000 WL 72087 at *8. Accordingly, the Third Circuit determined that the taxpayers in *Farley* were entitled not only to increase the basis of their S corporation stock but also to take deductions for their current and suspended losses. *Id.*

Similarly, in *Hogue v. United States*, No. 99-302-KI, 2000 WL 2651 (D. Or. Jan. 3, 2000), the court noted that § 108 is silent with respect to whether COD income passes through to