## GITLITZ ET AL. *v.* COMMISSIONER OF INTERNAL REVENUE

No. 99–1295.   Argued October 2, 2000—Decided January 9, 2001

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SCALIA, KENNEDY, SOUTER, and GINSBURG, JJ., joined. BREYER, J., filed a dissenting opinion, *post*, p. 220.

*Darrell D. Hallett* argued the cause for petitioners. With him on the briefs were *John M. Colvin* and *Robert J. Chicoine.*

*Kent L. Jones* argued the cause for respondent. With him on the brief were *Solicitor General Waxman, Acting Assistant Attorney General Junghans, Deputy Solicitor General Wallace, Teresa E. McLaughlin,* and *Edward T. Perelmuter.**

JUSTICE THOMAS delivered the opinion of the Court.

The Commissioner of Internal Revenue assessed tax deficiencies against petitioners David and Louise Gitlitz and Philip and Eleanor Winn because they used nontaxed discharge of indebtedness to increase their bases in S corporation stock and to deduct suspended losses. In this case we must answer two questions. First, we must decide whether the Internal Revenue Code (Code) permits taxpayers to increase bases in their S corporation stock by the amount of an S corporation's discharge of indebtedness excluded from gross income. And, second, if the Code permits such an in-

---

*\*Richard M. Lipton* and *Theodore R. Bots* filed a brief for the Real Estate Roundtable as *amicus curiae* urging reversal.

crease, we must decide whether the increase occurs before or after taxpayers are required to reduce the S corporation's tax attributes.

## I

David Gitlitz and Philip Winn[1] were shareholders of P. D. W. & A., Inc., a corporation that had elected to be taxed under Subchapter S of the Code, 26 U. S. C. §§ 1361–1379 (1994 ed. and Supp. III). Subchapter S allows shareholders of qualified corporations to elect a "pass-through" taxation system under which income is subjected to only one level of taxation. See *Bufferd* v. *Commissioner,* 506 U. S. 523, 525 (1993). The corporation's profits pass through directly to its shareholders on a pro rata basis and are reported on the shareholders' individual tax returns. See § 1366(a)(1)(A).[2] To prevent double taxation of income upon distribution from the corporation to the shareholders, § 1367(a)(1)(A) permits shareholders to increase their corporate bases by items of income identified in § 1366(a) (1994 ed. and Supp. III). Corporate losses and deductions are passed through in a similar manner, see § 1366(a)(1)(A), and the shareholders' bases in the S corporation's stock and debt are decreased accordingly, see §§ 1367(a)(2)(B), 1367(b)(2)(A). However, a shareholder cannot take corporate losses and deductions into account on his personal tax return to the extent that such items exceed his basis in the stock and debt of the S corporation. See

---

[1] Each man filed a joint tax return with his wife.

[2] Section 1366(a)(1) provides:

"In determining the tax under this chapter of a shareholder for the shareholder's taxable year in which the taxable year of the S corporation ends . . . , there shall be taken into account the shareholder's pro rata share of the corporation's—

"(A) items of income (including tax-exempt income), loss, deduction, or credit the separate treatment of which could affect the liability for tax of any shareholder . . . ."

§ 1366(d)(1) (Supp. III).  If those items exceed the basis, the excess is "suspended" until the shareholder's basis becomes large enough to permit the deduction.  See §§ 1366(d)(1), (2) (1994 ed. and Supp. III).

In 1991, P. D. W. & A. realized $2,021,296 of discharged indebtedness.  At the time, the corporation was insolvent in the amount of $2,181,748.  Because it was insolvent even after the discharge of indebtedness was added to its balance sheet, P. D. W. & A. excluded the entire discharge of indebtedness amount from gross income under 26 U. S. C. §§ 108(a) and 108(d)(7)(A).  On their tax returns, Gitlitz and Winn increased their bases in P. D. W. & A. stock by their pro rata share (50 percent each) of the amount of the corporation's discharge of indebtedness.  Petitioners' theory was that the discharge of indebtedness was an "item of income" subject to pass-through under § 1366(a)(1)(A).  They used their increased bases to deduct on their personal tax returns corporate losses and deductions, including losses and deductions from previous years that had been suspended under § 1366(d).  Gitlitz and Winn each had losses (including suspended losses and operating losses) that totaled $1,010,648.  With the upward basis adjustments of $1,010,648 each, Gitlitz and Winn were each able to deduct the full amount of their pro rata share of P. D. W. & A.'s losses.

The Commissioner determined that petitioners could not use P. D. W. & A.'s discharge of indebtedness to increase their bases in the stock and denied petitioners' loss deductions.  Petitioners petitioned the Tax Court to review the deficiency determinations.  The Tax Court, in its initial opinion, granted relief to petitioners and held that the discharge of indebtedness was an "item of income" and therefore could support a basis increase.  See *Winn* v. *Commissioner*, 73 TCM 3167 (1997), ¶ 97,286 RIA Memo withdrawn and reissued, 75 TCM 1840 (1998), ¶ 98,071 RIA Memo TC. In light of the Tax Court's decision in *Nelson* v. *Commis-*

*sioner*, 110 T. C. 114 (1998), aff'd, 182 F. 3d 1152 (CA10 1999),[3] however, the Tax Court granted the Commissioner's motion for reconsideration and held that shareholders may not use an S corporation's untaxed discharge of indebtedness to increase their bases in corporate stock. See *Winn* v. *Commissioner*, 75 TCM 1840 (1998), ¶ 98,071 RIA Memo TC.

The Court of Appeals affirmed. See 182 F. 3d 1143 (CA10 1999). It assumed that excluded discharge of indebtedness is an item of income subject to pass-through to shareholders pursuant to § 1366(a)(1)(A), *id.*, at 1148, 1151, n. 7, but held that the discharge of indebtedness amount first had to be used to reduce certain tax attributes of the S corporation under § 108(b), and that only the leftover amount could be used to increase basis.[4] The Court of Appeals explained that, because the tax attribute to be reduced (in this case the corporation's net operating loss) was equal to the amount of discharged debt, the entire amount of discharged debt was absorbed by the reduction at the corporate level, and nothing remained of the discharge of indebtedness to be passed through to the shareholders under § 1366(a)(1)(A). *Id.*, at 1151. Because Courts of Appeals have disagreed on how to treat discharge of indebtedness of an insolvent S corporation, compare *Gaudiano* v. *Commissioner*, 216 F. 3d 524, 535 (CA6 2000) (holding that tax attributes are reduced before excluded discharged debt income is passed through to shareholders), cert. pending, No. 00–459; *Witzel* v. *Commissioner*, 200 F. 3d 496, 498 (CA7 2000) (same), cert. pending,

[3] In *Nelson*, the Tax Court held that excluded discharge of indebtedness does not pass through to an S corporation's shareholders because § 108 is an exception to normal S corporation pass-through rules. Specifically, the court held that, because § 108(d)(7)(A) requires that "subsections (a) [and (b) of § 108] shall be applied at the corporate level" in the case of an S corporation, it precludes any pass-through of the discharge of indebtedness to the *shareholder* level. See *Nelson*, 110 T. C., at 121–124.

[4] Section 108(b)(1) reads: "The amount excluded from gross income under [§ 108(a)(1)] shall be applied to reduce the tax attributes of the taxpayer . . . ."

No. 99–1693; and 182 F. 3d, at 1150 (case below), with *United States* v. *Farley*, 202 F. 3d 198, 206 (CA3 2000) (holding that excluded discharged debt income is passed through to shareholders before tax attributes are reduced), cert. pending, No. 99–1675 [REPORTER'S NOTE: See *post*, p. 1111]; see also *Pugh* v. *Commissioner*, 213 F. 3d 1324, 1330 (CA11 2000) (holding that excluded discharged debt income is subject to pass-through and can increase basis), cert. pending, No. 00–242, we granted certiorari. 529 U. S. 1097 (2000).

## II

Before we can reach the issue addressed by the Court of Appeals—whether the increase in the taxpayers' corporate bases occurs before or after the taxpayers are required to reduce the S corporation's tax attributes—we must address the argument raised by the Commissioner.[5] The Commissioner argues that the discharge of indebtedness of an insolvent S corporation is not an "item of income" and thus never passes through to shareholders. Under a plain reading of the statute, we reject this argument and conclude that excluded discharged debt is indeed an "item of income," which passes through to the shareholders and increases their bases in the stock of the S corporation.

---

[5] The Commissioner has altered his arguments throughout the course of this litigation. According to the Tax Court, during the first iteration of this case the Commissioner made several arguments but then settled on a "final" one—that the discharge of indebtedness of the insolvent S corporation was not an "item of income," see 73 TCM 3167 (1997), ¶ 97,286 RIA Memo TC. In the Court of Appeals, the Commissioner argued instead that, because any pass-through of excluded discharge of indebtedness to petitioners took place after any reduction of tax attributes and by then the income would have been fully absorbed by the tax attributes, no discharged debt remained to flow through to petitioners. The Commissioner relegated to a footnote his argument that discharge of indebtedness is not an "item of income." See Brief for Appellee in Nos. 98–9009 and 98–9010 (CA10), p. 33, n. 14.

Section 61(a)(12) states that discharge of indebtedness generally is included in gross income. Section 108(a)(1) provides an express exception to this general rule:

"Gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge . . . of indebtedness of the taxpayer if—

.          .          .          .          .

"(B) the discharge occurs when the taxpayer is insolvent."

The Commissioner contends that this exclusion from gross income alters the character of the discharge of indebtedness so that it is no longer an "item of income." However, the text and structure of the statute do not support the Commissioner's theory. Section 108(a) simply does not say that discharge of indebtedness ceases to be an *item of income* when the S corporation is insolvent. Instead it provides only that discharge of indebtedness ceases to be *included in gross income*. Not all items of income are included in gross income, see § 1366(a)(1) (providing that "items of income," including "tax-exempt" income, are passed through to shareholders), so mere exclusion of an amount from gross income does not imply that the amount ceases to be an item of income. Moreover, §§ 101 through 136 employ the same construction to exclude various items from gross income: "Gross income does not include . . . ." The consequence of reading this language in the manner suggested by the Commissioner would be to exempt all items in these sections from pass-through under § 1366. However, not even the Commissioner encourages us to reach this sweeping conclusion. Instead the Commissioner asserts that discharge of indebtedness is unique among the types of items excluded from gross income because no economic outlay is required of the taxpayer re-

ceiving discharge of indebtedness. But the Commissioner is unable to identify language in the statute that makes this distinction relevant, and we certainly find none.

On the contrary, the statute makes clear that § 108(a)'s exclusion does not alter the character of discharge of indebtedness as an item of income. Specifically, § 108(e)(1) reads:

> "Except as otherwise provided in this section, there shall be no insolvency exception from the general rule that gross income includes income from the discharge of indebtedness."

This provision presumes that discharge of indebtedness is always "income," and that the only question for purposes of § 108 is whether it is includible in gross income. If discharge of indebtedness of insolvent entities were not actually "income," there would be no need to provide an exception to its inclusion in gross income; quite simply, if discharge of indebtedness of an insolvent entity were not "income," it would necessarily not be included in gross income.

Notwithstanding the plain language of the statute, the Commissioner argues, generally, that excluded discharge of indebtedness is not income and, specifically, that it is not "tax-exempt income" under § 1366(a)(1)(A).[6] First, the

---

[6] The Commissioner also contends, as does the dissent, that because § 108(d)(7)(A) mandates that the discharged debt amount be determined and applied to reduce tax attributes "at the corporate level," rather than at the shareholder level, the discharged debt, even if it is some type of income, simply cannot pass through to shareholders. In other words, the Commissioner contends that § 108(d)(7)(A) excepts excluded discharged debt from the general pass-through provisions for S corporations. However, § 108(d)(7)(A) merely directs that the exclusion from gross income and the tax attribute reduction be made at the corporate level. Section 108(d)(7)(A) does not state or imply that the debt discharge provisions shall apply *only* "at the corporate level." The very purpose of Subchapter S is to tax at the shareholder level, not the corporate level. Income is determined at the S corporation level, see § 1363(b), not in order to tax

Commissioner argues that § 108 merely codified the "judicial insolvency exception," and that, under this exception, discharge of indebtedness of an insolvent taxpayer was not considered income. The insolvency exception was a rule that the discharge of indebtedness of an insolvent taxpayer was not taxable income. See, *e. g., Dallas Transfer & Terminal Warehouse Co.* v. *Commissioner,* 70 F. 2d 95 (CA5 1934); *Astoria Marine Construction Co.* v. *Commissioner,* 12 T. C. 798 (1949). But the exception has since been limited by § 108(e). Section 108(e) precludes us from relying on any understanding of the judicial insolvency exception that was not codified in § 108. And as explained above, the language and logic of § 108 clearly establish that, although discharge of indebtedness of an insolvent taxpayer is not included in gross income, it is nevertheless income.

The Commissioner also relies on a Treasury Regulation to support his theory that no income is realized from the discharge of the debt of an insolvent:

> "*Proceedings under Bankruptcy Act.*
>
> "(1) Income is not realized by a taxpayer by virtue of the discharge, under section 14 of the Bankruptcy Act (11 U. S. C. 32), of his indebtedness as the result of an adjudication in bankruptcy, or by virtue of an agreement among his creditors not consummated under any provision of the Bankruptcy Act, if immediately thereafter the taxpayer's liabilities exceed the value of his assets." 26 CFR § 1.61–12(b) (2000).

Even if this regulation could be read (countertextually) to apply outside the bankruptcy context, it merely states that

---

the corporation, see § 1363(a) (exempting an S corporation from income tax), but solely to pass through to the S corporation's shareholders the corporation's income. Thus, the controlling provision states that, in determining a shareholder's liability, "there shall be taken into account the shareholder's pro rata share of the corporation's . . . items of income (including tax-exempt income) . . . ." § 1366(a)(1). Nothing in § 108(d)(7)(A) suspends the operation of these ordinary pass-through rules.

"[i]ncome is not *realized*." The regulation says nothing about whether discharge of indebtedness is income subject to pass-through under § 1366.

Second, the Commissioner argues that excluded discharge of indebtedness is not "tax-exempt" income under § 1366(a)(1)(A), but rather "tax-deferred" income. According to the Commissioner, because the taxpayer is required to reduce tax attributes that could have provided future tax benefits, the taxpayer will pay taxes on future income that otherwise would have been absorbed by the forfeited tax attributes. Implicit in the Commissioner's labeling of such income as "tax-deferred," however, is the erroneous assumption that § 1366(a)(1)(A) does not include "tax-deferred" income. Section 1366 applies to "items of income." This section expressly includes "tax-exempt" income, but this inclusion does not mean that the statute must therefore exclude "tax-deferred" income. The section is worded broadly enough to include any item of income, even tax-deferred income, that "could affect the liability for tax of any shareholder." § 1366(a)(1)(A). Thus, none of the Commissioner's contentions alters our conclusion that discharge of indebtedness of an insolvent S corporation is an item of income for purposes of § 1366(a)(1)(A).

## III

Having concluded that excluded discharge of indebtedness is an "item of income" and is therefore subject to pass-through to shareholders under § 1366, we must resolve the sequencing question addressed by the Court of Appeals— whether pass-through is performed before or after the reduction of the S corporation's tax attributes under § 108(b). Section 108(b)(1) provides that "[t]he amount excluded from gross income under [§ 108(a)] shall be applied to reduce the tax attributes of the taxpayer as provided [in this section]." Section 108(b)(2) then lists the various tax attributes to be reduced in the order of reduction. The first tax attribute to

be reduced, and the one at issue in this case, is the net operating loss. See § 108(b)(2)(A). Section 108(d)(7)(B) specifies that, for purposes of attribute reduction, the shareholders' suspended losses for the taxable year of discharge are to be treated as the S corporation's net operating loss. If tax attribute reduction is performed *before* the discharge of indebtedness is passed through to the shareholders (as the Court of Appeals held), the shareholders' losses that exceed basis are treated as the corporation's net operating loss and are then reduced by the amount of the discharged debt. In this case, no suspended losses would remain that would permit petitioners to take deductions.[7] If, however, attribute reduction is performed *after* the discharged debt income is passed through (as petitioners argue), then the shareholders would be able to deduct their losses (up to the amount of the increase in basis caused by the discharged debt). Any suspended losses remaining then will be treated as the S corporation's net operating loss and will be reduced by the amount of the discharged debt. Therefore, the sequence of the steps of pass-through and attribute reduction determines whether petitioners here were deficient when they increased their bases by the discharged debt amount and deducted their losses.

---

[7] Under this scenario, the shareholders' losses would be reduced by the discharge of indebtedness. However, it is unclear precisely what would happen to the discharge of indebtedness. The Court of Appeals below stated that the discharged debt would be "absorbed" by the reduction to the extent of the net operating loss and that therefore only the excess excluded discharged debt would remain to pass through to the shareholders. 182 F. 3d 1143, 1149 (CA10 1999). In contrast, another Court of Appeals suggested, albeit in dictum, that the full amount of the discharge might still pass through to the shareholder and be used to increase basis; the discharged debt amount would reduce the net operating loss but would not be absorbed by it. *Witzel* v. *Commissioner*, 200 F. 3d 496, 498 (CA7 2000). We need not resolve this issue because we conclude that the discharge of indebtedness passes through before any attribute reduction takes place.

The sequencing question is expressly addressed in the statute. Section 108(b)(4)(A) directs that the attribute reductions "shall be made *after* the determination of the *tax imposed* by this chapter for the taxable year of the discharge." (Emphases added.) See also § 1017(a) (applying the same sequencing when § 108 attribute reduction affects basis of corporate property). In order to determine the "tax imposed," an S corporation shareholder must adjust his basis in his corporate stock and pass through all items of income and loss. See §§ 1366, 1367 (1994 ed. and Supp. III). Consequently, the attribute reduction must be made *after* the basis adjustment and pass-through. In the case of petitioners, they must pass through the discharged debt, increase corporate bases, and then deduct their losses, all before any attribute reduction could occur. Because their basis increase is equal to their losses, petitioners have no suspended losses remaining. They, therefore, have no net operating losses to reduce.

Although the Commissioner has now abandoned the reasoning of the Court of Appeals below,[8] we address the pri-

---

[8] The Commissioner has abandoned his argument related to the sequencing issue before this Court. This abandonment is particularly odd given that the sequencing issue predominated in the Commissioner's argument to the Court of Appeals. Notwithstanding the Commissioner's attempt at oral argument to distance himself from the reasoning of the Court of Appeals on this issue—the Commissioner represented to us that the Court of Appeals developed its reading of the statute *sua sponte,* Tr. of Oral Arg. 22–24, 27—it is apparent from the Commissioner's brief in the Court of Appeals that the Commissioner *supplied* the very sequencing theory that the Court of Appeals adopted. Compare, *e. g.,* Brief for Appellee in Nos. 98–9009 and 98–9010 (CA10), p. 28 ("First, the discharge of indebtedness income that is excluded under Section 108(a) at the corporate level is temporarily set aside and has no tax consequences . . . . Second, PDW & A computes its tax attributes, *i. e.,* taxpayers' suspended losses. Third, the excluded discharge of indebtness income is applied against and eliminates the suspended losses. Because the excluded income is applied against—and offset by—the suspended losses, no item of income flows through to taxpayers under Section 1366(a), and no upward basis adjust-

mary arguments made in the Courts of Appeals against petitioners' reading of the sequencing provision. First, one court has expressed the concern that, if the discharge of indebtedness is passed through to the shareholder *before* the tax attributes are reduced, then there can never be any discharge of indebtedness remaining "at the corporate level," § 108(d)(7)(A), by which to reduce tax attributes.[9] *Gaudiano*, 216 F. 3d, at 533. This concern presumes that tax attributes can be reduced only if the discharge of indebtedness itself remains at the corporate level. The statute, however, does not impose this restriction. Section 108(b)(1) requires only that the tax attributes be reduced by "[t]he *amount* excluded from gross income" (emphasis added), and that amount is not altered by the mere pass-through of the income to the shareholder.

Second, courts have discussed the policy concern that, if shareholders were permitted to pass through the discharge of indebtedness before reducing any tax attributes, the shareholders would wrongly experience a "double windfall":

---

ment is made under Section 1367(a)" (citations omitted)), with, *e. g.*, 182 F. 3d, at 1151 ("PDW & A first must compute its discharge of indebtedness income and set this figure aside temporarily. The corporation then must calculate its net operating loss tax attribute .... Finally, the corporation must apply the excluded discharged debt to reduce its tax attributes. In this case, the net operating loss tax attribute fully absorbs the corporation's excluded discharge of indebtedness income. Thus, there are no items of income to pass through to Gitlitz and Winn").

[9] Similar to this argument is the contention that, in cases such as this one in which the shareholders' suspended losses are fully deducted before attribute reduction could take place, no net operating loss remains and no attribute reduction can occur, thus rendering § 108(b) inoperative. However, there will be other cases in which § 108(b) will be inoperative. In particular, if a taxpayer has no tax attributes at all, there will be no reduction. Certainly the statute does not condition the exclusion under § 108(a) on the ability of the taxpayer to reduce attributes under § 108(b). Likewise, in the case of shareholders similarly situated to petitioners in this case, there is also the possibility that other attributes, see §§ 108(b)(2)(B)–(G), could be reduced.

They would be exempted from paying taxes on the full amount of the discharge of indebtedness, *and* they would be able to increase basis and deduct their previously suspended losses. See, *e. g.,* 182 F. 3d, at 1147–1148. Because the Code's plain text permits the taxpayers here to receive these benefits, we need not address this policy concern.[10]

\* \* \*

The judgment of the Court of Appeals, accordingly, is reversed.

*It is so ordered.*

JUSTICE BREYER, dissenting.

I agree with the majority's reasoning with the exception of footnotes 6 and 10. The basic statutory provision before us is 26 U. S. C. § 108—the provision that excludes from the "gross income" of any "insolvent" taxpayer, income that cancellation of a debt (COD) would otherwise generate. As the majority acknowledges, however, *ante,* at 214–215, n. 6, § 108 contains a subsection that sets forth a special exception. The exception, entitled "Special rules for S corporation," says:

---

[10] The benefit at issue in this case arises in part because § 108(d)(7)(A) permits the exclusion of discharge of indebtedness income from gross income for an insolvent S corporation even when the S corporation shareholder is personally solvent. We are aware of no other instance in which § 108 directly benefits a solvent entity. However, the result is required by statute. Between 1982 and 1984, § 108 provided that the exclusion from gross income and the reduction in tax attributes occurred at the shareholder level. See Subchapter S Revision Act of 1982, Pub. L. 97–354, § 3(e), 96 Stat. 1689. This provision, which paralleled the current taxation of partnerships at the partner level, see 26 U. S. C. § 108(d)(6), prevented solvent shareholders from benefiting as a result of their S corporation's insolvency. In 1984, however, Congress amended the Code to provide that § 108 be applied "at the corporate level." Tax Reform Act of 1984, Pub. L. 98–369, § 721(b), 98 Stat. 966. It is as a direct result of this amendment that the solvent petitioners in this case are able to benefit from § 108's exclusion.

"(A) Certain provisions to be applied at corporate level.

"In the case of an S corporation, subsections (a), (b), (c), and (g) shall be applied at the corporate level." 26 U. S. C. § 108(d)(7)(A).

If one reads this language literally as exclusive, both the COD exclusion (§ 108(a)) and the tax attribute reduction (§ 108(b)) would apply only "at the corporate level." Hence the COD income would not flow through to S corporation shareholders. Consequently, the insolvent S corporation's COD income would not increase the shareholder's basis and would not help the shareholder take otherwise unavailable deductions for suspended losses.

The Commissioner argues that we should read the language in this way as preventing the flow-through of the corporation's COD income. Brief for Respondent 27. He points to the language of a House Committee, which apparently thought, when Congress passed an amendment to § 108, that the Commissioner's reading is correct. H. R. Rep. No. 103–111, pp. 624–625 (1993) ("[T]he exclusion and basis reduction are both made at the S corporation level (sec. 108(d)(7)). The shareholders' basis in their stock is not adjusted by the amount of debt discharge income that is excluded at the corporate level"). At least one commentator believes the same. See Loebl, Does the Excluded COD Income of an Insolvent S Corporation Increase the Basis of the Shareholders' Stock?, 52 U. Fla. L. Rev. 957, 981–988 (2000). But see Lockhart & Duffy, Tax Court Rules in *Nelson* That S Corporation Excluded COD Income Does Not Increase Shareholder Stock Basis, 25 Wm. Mitchell L. Rev. 287 (1999).

The Commissioner finds support for his literal, exclusive reading of § 108(d)(7)(A)'s language in the fact that his reading would close a significant tax loophole. That loophole—preserved by the majority—would grant a *solvent* shareholder of an insolvent S corporation a tax benefit in the form of permission to take an otherwise unavailable deduction,

thereby sheltering other, unrelated income from tax. See *Witzel* v. *Commissioner*, 200 F. 3d 496, 497 (CA7 2000) (Posner, C. J.) ("It is hard to understand the rationale for using a tax exemption to avoid taxation not only on the income covered by the exemption but also on unrelated income that is not tax exempt"). Moreover, the benefit often would increase in value as the amount of COD income increases, a result inconsistent with congressional intent to impose a "price" (attribute reduction), see Lipton, Different Courts Adopt Different Approaches to the Impact of COD Income on S Corporations, 92 J. Tax. 207 (2000), on excluded COD. Further, this deduction-related tax benefit would have very different tax consequences for identically situated taxpayers, depending only upon whether a single debt can be split into segments, each of which is canceled in a different year. For example, under the majority's interpretation, a $1 million debt canceled in one year would permit Taxpayer A to deduct $1 million of suspended losses in that year, thereby permitting A to shelter $1 million of unrelated income in that year. But because § 108 reduces tax attributes after the first year, five annual cancellations of $200,000 will not create a $1 million shelter. Timing is all important.

The majority acknowledges some of these policy concerns and confesses ignorance of any "other instance in which § 108 directly benefits a solvent entity," but claims that its reading is mandated by the plain text of § 108(d)(7)(A) and therefore that the Court may disregard the policy consequences. *Ante*, at 220, n. 10. It is difficult, however, to see why we should interpret that language as treating different solvent shareholders differently, given that the words "at the corporate level" were added "[i]n order to treat all shareholders in the same manner." H. R. Rep. No. 98–432, pt. 2, p. 1640 (1984). And it is more difficult to see why, given the fact that the "plain language" admits either interpretation, we should ignore the policy consequences. See *Commissioner* v. *Gillette Motor Transport, Inc.*, 364 U. S. 130, 134–135

(1960) (abandoning literal meaning of 26 U. S. C. § 1221 (1958 ed.) for a reading more consistent with congressional intent). Accord, *Commissioner* v. *P. G. Lake, Inc.*, 356 U. S. 260, 264–267 (1958); *Corn Products Refining Co.* v. *Commissioner*, 350 U. S. 46, 51–52 (1955); *Hort* v. *Commissioner*, 313 U. S. 28, 30–31 (1941).

The arguments from plain text on both sides here produce ambiguity, not certainty. And other things being equal, we should read ambiguous statutes as closing, not maintaining, tax loopholes. Such is an appropriate understanding of Congress' likely intent. Here, other things are equal, for, as far as I am aware, the Commissioner's literal interpretation of § 108(d)(7)(A) as exclusive would neither cause any tax-related harm nor create any statutory anomaly. Petitioners argue that it would create a linguistic inconsistency, for they point to a Treasury Regulation that says that the Commissioner will apply hobby loss limitations under § 183 "at the corporate level in determining" allowable deductions, while, presumably, nonetheless permitting the deduction so limited to flow through to the shareholder. Treas. Reg. § 1.183–1(f), 26 CFR § 1.183–1(f) (2000). But we are concerned here with the *"application"* of an exclusion, not with *"determining"* the amount of a deduction. Regardless, the regulation's use of the words "at the corporate level," like the three other appearances of the formulation "applied" or "determined" "at the corporate level" in the Code, occur in contexts that are so very different from this one that nothing we say here need affect their interpretation. See 26 U. S. C. § 49(a)(1)(E)(ii)(I) (determining whether financing is recourse financing); 26 U. S. C. § 264(f)(5)(B) (1994 ed., Supp. III) (determining how to allocate interest expense to portions of insurance policies); 26 U. S. C. § 302(e)(1)(A) (determining whether a stock distribution shall be treated as a partial liquidation). If there are other arguments militating in favor of the majority's interpretation, I have not found them.

The majority, in footnote 6, says that the words "at the corporate level" in § 108(d)(7)(A) apply to the exclusion of COD income from corporate income and to "tax attribute reduction," but do not "suspen[d] the operation of . . . ordinary pass-through rules" because § 108(d)(7)(A) "does not state or imply that the debt discharge provisions shall apply *only* 'at the corporate level.'" It is the majority, however, that should explain why it reads the provision as nonexclusive (where, as here, its interpretation of the Code results in the "practical equivalent of [a] double deduction," *Charles Ilfeld Co.* v. *Hernandez,* 292 U. S. 62, 68 (1934)). See *United States* v. *Skelly Oil Co.,* 394 U. S. 678, 684 (1969) (requiring "clear declaration of intent by Congress" in such circumstances). I do not contend that § 108(d)(7)(A) *must* be read as having exclusive effect, only that, given the alternative, this interpretation provides the best reading of § 108 as a whole. And I can find no "clear declaration of intent by Congress" to support the majority's contrary conclusion regarding § 108(d)(7)(A)'s effect. It is that conclusion from which, for the reasons stated, I respectfully dissent.