**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 13-2247
———

R BALL FOR R BALL III BY APPT

v.

COMMISSIONER OF INTERNAL REVENUE

(Tax Court No. 11-17593)
————————

R BALL CHILDREN TRUST 9/9/1969

v.

COMMISSIONER OF INTERNAL REVENUE

(Tax Court No. 11-17594)
————————

ETHEL BALL FOR R BALL III APT 2/9/1967

v.

COMMISSIONER OF INTERNAL REVENUE

(Tax Court No. 11-17595)
_____

ETHEL BALL FOR A L BALL AS APPT

v.

COMMISSIONER OF INTERNAL REVENUE

(Tax Court No. 11-17596)
_____

R BALL JR. CHILDRENTRUST 1/29/1970

v.

COMMISSIONER OF INTERNAL REVENUE

(Tax Court No. 11-17597)
_____

R BALL JR. F/B/O R BALL III 12/22/1976

v.

COMMISSIONER OF INTERNAL REVENUE

(Tax Court No. 11-17598)
_____

R BALL FOR A L BALL BY APPT

v.

2

COMMISSIONER OF INTERNAL REVENUE

(Tax Court No. 11-17599)
_____

R BALL CHILDREN TRUST 1/24/1973

v.

COMMISSIONER OF INTERNAL REVENUE

(Tax Court No. 11-17600)
_____

RUSSELL BALL JR SEC FIRST 9/9/1967

v.

COMMISSIONER OF INTERNAL REVENUE

(Tax Court No. 11-17601)
_____

R BALL FOR R BALL III BY APPT; R BALL CHILDREN
TRUST 9/9/1969; ETHEL BALL FOR R BALL III APT
2/9/1967; ETHEL BALL FOR A L BALL AS APPT; R
BALL JR. CHILDRENTRUST 1/29/1970; R BALL JR.
F/B/O R BALL III 12/22/1976; R BALL FOR A L BALL BY
APPT; R BALL CHILDREN TRUST 1/24/1973; RUSSELL
BALL JR SEC FIRST 9/9/1967,
Appellants
_____

On Appeal from the United States Tax Court
(Tax Court Nos. 17593-11, 17594-11, 17595-11, 17596-11,
17597-11, 17598-11,
17599-11, 17600-11, 17601-11)
Tax Court Judge: Honorable Kathleen Kerrigan
_____

Argued: December 17, 2013

Before: JORDAN, VANASKIE, and VAN ANTWERPEN,
*Circuit Judges*.

(Filed: February 12, 2014)

Nancy Winkelman, Esq. **[ARGUED]**
Timothy K. Lewis, Esq.
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
         *Attorneys for Appellants*

Francesca Ugolini, Esq. **[ARGUED]**
Richard Farber, Esq.
Kathryn Keneally, Esq.
United States Department of Justice, Tax Division
P.O. Box 502
Washington, D.C. 20044
         *Attorneys for Appellee*
_____

OPINION OF THE COURT
_____

VAN ANTWERPEN, *Circuit Judge*.

## I. INTRODUCTION

An S corporation ("S Corp.") is a small business corporation that is permitted to have its corporate income, losses, deductions, and credits attributed to its shareholders. This appeal arises out of nine consolidated cases before the United States Tax Court regarding the tax implications of an S Corp.'s election to treat its subsidiary as a "qualified subchapter S subsidiary" ("Qsub") under Internal Revenue Code § 1361.[1] Specifically, the parties disagree as to whether the Qsub election and subsequent sale of the S Corp. parent creates an "item of income" under § 1366(a)(1)(A)[2] thereby

---

[1] 26 U.S.C. § 1361. All statutory citations refer to the Internal Revenue Code unless otherwise noted.

[2] The relevant portion stating:

> In determining the tax under this chapter of a shareholder for the shareholder's taxable year in which the taxable year of the S corporation ends (or for the final taxable year of a shareholder who dies, or of a trust or estate which terminates, before the end of the corporation's taxable year), there shall be taken into account the shareholder's pro rata share of the corporation's—
> (A) items of income (including tax-exempt income), loss, deduction, or credit the separate treatment of which could affect the liability for tax of any shareholder . . . .

requiring the parties who held stock in the parent S Corp. to adjust their bases in stock under § 1367(a)(1)(A).[3] For reasons which follow, we affirm the decision of the Tax Court, finding an increase in stock bases and declared losses to be improper.

## II. FACTS

In June 1997, ten trusts for the benefit of the Ball family ("Trusts")[4] acquired direct ownership of all shares of

---

26 U.S.C. § 1366(a)(1)(A).

[3] "The basis of each shareholder's stock in an S corporation shall be increased for any period by the sum of the following items determined with respect to that shareholder for such period: (A) the items of income described in subparagraph (A) of section 1366(a)(1) . . . ." *Id.* § 1367(a)(1)(A).

[4] The named Trusts are nine of ten total trusts: R. Ball for R. Ball III, By Appt.; R. Ball Children Trust 9/9/1969; Ethel Ball for R. Ball III Apt. 2/9/1967; Ethel Ball for A.L. Ball as Appt.; R. Ball Jr. F/B/O R. Ball III 12/22/1976; R. Ball for A. L. Ball By Appt.; R Ball Jr. Children Trust 1/29/1970; R. Ball For Children Trust 1/24/1973; Russell Ball Jr. Sec. First 9/9/1967. The tenth trust has a related case stayed in the United States District Court for the Eastern District of Pennsylvania pending this appeal. *See R. Ball, Jr. For A. L. Ball Trust, December 22, 1976 v. United States*, 2:12-cv-921 (E.D. Pa. Feb. 22, 2012). For purposes of this appeal, the term "Trusts" will include the tenth trust, though not a party, except that, in section V of this opinion, our use of the term generally refers only to the nine Appellants.

6

American Insurance Service, Inc. ("AIS")[5] with an aggregate basis in AIS stock totaling $5,612,555. In 1999, the Trusts formed Wind River Investment Corporation ("Wind River"), a Delaware corporation. The Trusts then contributed their shares in AIS in exchange for all of the shares of Wind River. This resulted in Wind River owning all of the shares of AIS. Effective June 4, 1999, Wind River designated itself a subchapter S Corporation. On February 28, 2003, Wind River elected to treat AIS as a Qsub under § 1361(b)(3).[6] Prior to the Qsub election, the Trusts' aggregate adjusted basis in the Wind River stock was $15,246,099. Following the Qsub election, the Trusts increased their bases in the Wind River stock from $15,246,099 to a new basis of $242,481,544.[7]

---

[5] AIS is a Pennsylvania corporation. Although it became a subsidiary of Wind River, AIS was also the parent company of a group of insurance-affiliated corporations. Prior to acquiring direct ownership of all AIS shares, the Trusts had previously indirectly owned shares in AIS.

[6] 26 U.S.C. § 1361(b)(3). A Qsub is a wholly owned subsidiary of a parent S Corp., and as such, "all assets, liabilities, and items of income, deduction, and credit of a qualified subchapter S subsidiary shall be treated as assets, liabilities, and such items (as the case may be) of the S corporation." *Id.* § (b)(3)(A)(ii).

[7] The fair market value of AIS's assets at the time it was absorbed by Wind River was $232,848,000 and by subtracting the prior aggregate basis of AIS stock of $5,612,555, an increase of $227,235,445 results. When this increase is added to the prior basis of $15,246,099, a new basis of $242,481,544 is arrived at for Wind River. This basis increase and its tax consequences are the subject of this appeal.

Following the Qsub election and stock basis adjustments, the Trusts sold their interests in Wind River to a third party, Fox Paine, on September 5, 2003. After transaction costs, this sale yielded $230,111,857 in cash and securities in exchange for all of the Wind River stock.[8] Even though they had received $230,111,857 from the sale, the Trusts claimed a loss in the amount of $12,247,229.[9] This was calculated as the difference between the amount actually received for the sale and the new basis in the Wind River stock. The Trusts shareholders' 2003 tax returns were filed citing the aforementioned capital loss.

The Internal Revenue Service ("IRS") determined the Trusts should not have increased their bases in the Wind River stock to $242,481,544 following the Qsub election. The IRS determined instead that a capital gain of approximately $214 million had been realized from the sale of Wind River to Fox Paine. This resulted in a cumulative tax deficiency of $33,747,858 for the nine trusts that have filed appeals in this case. Deficiency notices were sent to the Trusts on May 18 and 19, 2011, stating "the Qsub election and the resulting

---

[8] The amount received individually by the Trusts was divided based on percentage of ownership.

[9] The figures stated for the new basis, sale proceeds, and tax loss are totals for all ten trusts. As mentioned above, only nine trusts are parties to this suit and, accordingly, the actual figures for the new basis and stock sale proceeds are somewhat less, being approximately $240,080,978 for the new basis and $227,833,750 for the sale proceeds. Subtracting one from the other yields the loss of $12,247,228.

8

deemed I.R.C. § 332[10] liquidation did not give rise to an item of income under I.R.C. § 1366(a)(1)(A); therefore, [the Trusts] could not increase the basis of their [Wind River] stock under I.R.C. [§] 1367(a)(1)(A)." (Appendix ("App.") at A373.) The Trusts filed petitions with the United States Tax Court seeking a redetermination of deficiencies under the jurisdiction of §§ 6213(a) and 7442. The cases were consolidated and submitted for decision on stipulated facts, under Tax Court Rule 122,[11] as *R. Ball for R. Ball III By Appt., et al. v. Commissioner*, 105 T.C.M. (CCH) 1257, 2013 WL 452722 (2013). As previously noted, the Tax Court found the increase in stock basis and declared loss to be improper.

## III. TAX COURT PROCEEDINGS

The main issue before the Tax Court and now on appeal is whether or not a Qsub election creates an "item of income" for the parent corporation under § 1366(a)(1)(A). The Trusts relied on their assertion that the election "resulted in a gain derived from dealings in property and, therefore,

---

[10] 26 U.S.C. § 332. § 332 governs the liquidation of a wholly-owned subsidiary into its parent corporation. "(a) General rule.--No gain or loss shall be recognized on the receipt by a corporation of property distributed in complete liquidation of another corporation." *Id.*
[11] "Any case not requiring a trial for the submission of evidence (as, for example, where sufficient facts have been admitted [or] stipulated . . .) may be submitted at any time after joinder of issue (see Rule 38) by motion of the parties filed with the Court." T.C. Rule 122(a).

9

created an item of income under § 61(a)."[12] *R. Ball*, 2013 WL 452722, at \*4. If the election resulted in an "item of income," the new higher bases and resulting tax losses are proper. If it did not result in an "item of income," the increase in stock bases and declared tax losses are improper.

More specifically, before the Tax Court, the Trusts argued that the deemed liquidation of AIS was, under § 331, a sale or exchange of property creating a realized gain to Wind River. They further claimed that gains from dealings in property are expressly included in gross income under § 61(a). They then contended that, although § 332 provides for the nonrecognition of that gain, it was still "an item of income (including tax exempt income)" under § 1366(a)(1)(A), which passed through to them and increased their bases in Wind River stock under § 1367(a)(1)(A). To support their position, the Trusts raised several contentions to the Commissioner's deficiency finding: (1) their bases were properly adjusted pursuant to § 1367(a)(1)(A), (2) the losses were properly claimed from the sale of Wind River, and (3) "the Qsub election resulted in an item of income pursuant to [§] 1366(a)(1)(A)." *See R. Ball*, 2013 WL 452722, at \*4. Lastly, the Trusts cited *United States v. Farley*[13] and *Gitlitz v. Commissioner*,[14] arguing that the "realized" liquidation gain under §§ 331 and 61(a)(3), allowed an increase in basis, but

---

[12] The relevant sections state: "[e]xcept as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: . . . (3) Gains derived from dealings in property. . . ." 26 U.S.C. § 61(a)(3).

[13] 202 F.3d 198 (3d Cir. 2000).

[14] 531 U.S. 206 (2001).

that gain is not taxable under the non-recognition provision of § 332(a). The Commissioner responded to the Trusts' arguments by asserting that the Qsub election did not create an "item of income (including tax exempt income)" under § 1366(a)(1)(A).

The Tax Court rejected the Trusts' arguments, relying on the differences between "realization" and "recognition" of income in determining what constitutes an "item of income" under § 1366 as it relates to §§ 1367, 331, 332, and 61(a). *R. Ball*, 2013 WL 452772, at *4-5 (2013). The Tax Court held that gain from a Qsub election is "realized" and calculated under § 1001,[15] yet it is not "recognized" due to the non-recognition provision of § 332. *Id.* ("Once the amount of the realized gain has been calculated, the entire amount of the realized gain is recognized unless a Code section provides for nonrecognition treatment."). Furthermore, the Court found, under § 1366, that when a gain is unrecognized, it "does not rise to the level of income" and is not an "item of income for tax purposes."[16] *Id.* at *7. Finally, the Court distinguished *Gitlitz* and *Farley* and determined that "neither case is squarely on point." *R. Ball*, 2013 WL 452722, at *8. The Court reasoned that *Gitlitz* and *Farley* only established that the nature of "discharge of indebtedness" as income is not affected by an exclusion elsewhere in the Code. *See id.* Here,

---

[15] "The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received." § 1001(b).

[16] In addition the Tax Court found no cases in which a Qsub election created an item of income for the parent S Corp. *R. Ball*, 2013 WL 452722, at *4.

however, "realized gain from the Qsub election was never included explicitly in gross income and was never excluded from gross income." *Id.* Therefore, the Tax Court determined *Gitlitz* and *Farley* were unpersuasive in qualifying the Qsub election as an "item of income" under § 1366. [17] *Id.*

In sum, the Court held that "unrecognized gain resulting from the Qsub election did not create an item of income or tax exempt income pursuant to section1366(a)(1)(A)." *Id.* at \*10. Accordingly, the Trusts were found deficient for improperly adjusting their bases in Wind River stock following the Qsub election and this appeal followed. *Id.*.

## IV. JURISDICTION

Section 7482(a) provides exclusive jurisdiction by this Court over decisions before the United States Tax Court. Our review of the Tax Court's construction of the Internal Revenue Code is plenary. *Nat'l Starch & Chem. Corp. v. Comm'r*, 918 F.2d 426, 428 (3d Cir. 1990).

## V. DISCUSSION

### A. Items of Income

As previously noted, the main issue before us is whether or not the Qsub election created an "item of income."

---

[17] The Court also noted that the cases have since been overridden by Congressional action amending 26 U.S.C. § 108(d)(7)(A). *Id.* at \*8; *see also* Job Creation and Worker Assistance Act of 2002, Pub.L. No. 107-147, 116 Stat. at 40.

An "item of income" is required for a shareholder of an S Corp. to increase the basis in his or her of the S Corp.. *See* § 1366(a)(1)(A).[18] Despite use of the term "item of income" in § 1366, it is not defined in the Internal Revenue Code and the Treasury regulations provide only guidance.[19] *See* 26 C.F.R. §

---

[18] "To prevent double taxation of income upon distribution from the corporation to the shareholders, § 1367(a)(1)(A) permits shareholders to increase their corporate bases by items of income identified in § 1366(a)." *Gitlitz*, 531 U.S. at 209.

[19] The separately stated items [of income] of the S corporation include, but are not limited to, the following items—

> (i) The corporation's combined net amount of gains and losses from sales or exchanges of capital assets . . .
> (ii) The corporation's combined net amount of gains and losses from sales or exchanges of property . . .
> (iii) Charitable contributions . . .
> (vi) Each of the corporation's separate items of gains and losses from wagering transactions (section 165(d)); soil and water conservation expenditures (section 175); deduction under an election to expense certain depreciable business expenses (section 179); medical, dental, etc., expenses (section 213) . . .
> . . . .
> (vii) Any of the corporation's items of portfolio income or loss, and expenses related thereto . . .

13

1.1366-1(a)(2); *see also Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426 (1955). "Gross income," however, is defined. It is governed by § 61, and includes "[g]ains derived from dealings in property," as well as "[i]ncome from discharge of indebtedness."[20] *Id.* § 61(a)(3), (12). Further, the Supreme Court has defined "gross income" as "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." *Glenshaw Glass*, 348 U.S. at 431. Gains derived from the property obtained by electing and liquidating the Qsub are claimed by the Trusts to be "items of income" for

---

> (viii) The corporation's tax-exempt income. For purposes of subchapter S, tax-exempt income is income that is permanently excludible from gross income in all circumstances in which the applicable provision of the Internal Revenue Code applies . . . .

26 C.F.R. § 1.1366-1(a)(2).

[20] Other gross income measurements are:

> Compensation for services, including fees, commissions, fringe benefits, and similar items; Gross income derived from business; Interest; Rents; Royalties; Dividends; Alimony and separate maintenance payments; Annuities; Income from life insurance and endowment contracts; Pensions; Income from discharge of indebtedness; Distributive share of partnership gross income; Income in respect of a decedent; and Income from an interest in an estate or trust.

26 U.S.C. § 61(a).

14

the purpose of § 1366. Fundamentally, the Trusts claim there was a gain from liquidation (§ 61(a)), that gain was "realized" (§ 331) and calculated (§ 1001), and thus is an "item of income" (§ 1366). (Appellant Br. at 17.) The Trusts summarily dismiss the effect of non-recognition on whether a gain is income; however, this premise is undermined by regulations corresponding to § 61(a).[21] Under the § 61(a) Treasury Regulations, gains from the sale or exchange of property, including those derived under § 331, are not "recognized," and thus "not included in or deducted from gross income at the time the transaction occurs."[22] 26 C.F.R. § 1.61-6(b)(1).

While "item of income" is a broad and undefined term, it is not one without limits. § 61(a) provides a "broad definition of 'gross income,'" that is "sweeping [in] scope," unless "excepted by another provision in the tax code." *Comm'r v. Schleier*, 515 U.S. 323, 328-29 (1995). The Supreme Court concluded that "income" requires an

---

[21] The Trusts state, "[i]n sum, that realized gain is not recognized does not alter the fact that the realized gain is income . . . ." (Appellant Br. at 18.)

[22] Appellants assert that the quoted language from 26 C.F.R. 1.61 -6(b)(1) only addresses issues of timing, namely that realized but unrecognized gain is not taken into account when the transaction occurs. They support that assertion with examples of income defined under subsections of § 61(a) but then subject to nonrecognition treatment elsewhere. Those examples are distinguishable from the gains at issue here because the examples of income are expressly provided for under § 61(a) and are not analogous to the unique treatment of Qsub liquidations under the Code.

15

"accession to wealth." *Glenshaw Glass*, 348 U.S. at 431. The Qsub election did not add wealth, it merely changed the tax treatment of the income flowing from the Qsub. This reformation by liquidation did not provide an "accession to wealth" for the corporation and therefore could not create "income" for the Trusts.

### B. Realization and Recognition of Gains

The Internal Revenue Code

> defers the tax consequences of a gain or loss in property value until the taxpayer 'realizes' the gain or loss. The realization requirement is implicit in § 1001(a) of the Code, which defines '[t]he gain [or loss] from the sale or other disposition of property' as the difference between 'the amount realized' from the sale or disposition of the property and its 'adjusted basis.'

*Cottage Sav. Ass'n v. Comm'r*, 499 U.S. 554, 559 (1991) (quoting 26 U.S.C. § 1001(a-b)). "To realize a gain or loss in the value of property, the taxpayer must engage in a 'sale or other disposition of [the] property.'" *Id.* (quoting § 1001(a)). The Commissioner and the Trusts differ as to whether "realizing" a gain is enough to create an "item of income" under § 1366, or whether this section requires the gain to be "recognized." The Tax Court concluded that "nonrecognition provisions prevent realized gain from being included in a taxpayer's gross income." *R. Ball*, 2013 WL 452722, at *5. The Trusts contend that the Tax Court "confused the concepts of realization and recognition." (Appellants' Opening Br. at 14.) They argue that the Tax Court reached the

16

"unprecedented conclusion that because 'no gain was recognized, . . . the unrecognized gain did not create an item of income under § 61(a)(3),' or § 1355(a)(1)(A)." (*Id.* at 15 (quoting App. at 24.) The Trusts assert that the "crux of the Tax Court's error" is its determination that "unrecognized gain does not rise to the level of income." (*Id.*) They argue that the Code cannot be parsed to create some realized gain that is income and some realized gain that, by virtue of nonrecognition, is not. According to the Trusts, realized gain is always income, a categorization that does not change if that realized gain is then unrecognized.

Inherent in this conflict is which statutory provision, §§ 331 or 332, applies to the liquidation of AIS via Qsub election. Section 331, governing "gain or loss to shareholders in corporate liquidations," states "[a]mounts received by a shareholder in a distribution in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock." The payment via liquidation is realized and calculated by adding "any money received plus the fair market value of the property (other than money) received." 26 U.S.C. § 1001(b). At this point, the Trusts argue that the realized gain becomes an "item of income" by way of § 61(a)(3) and the Supreme Court's holding in *Gitlitz. Id.* § 61(a)(3) ("[G]ross income means all income from whatever source derived, including . . . [g]ains derived from dealings in property . . . ."); 531 U.S. at 213. The Trusts argue § 331 applies to "realize" the gain. The Trusts claim the gain is defined in § 61(a) and that it is then calculated under § 1001(a). The Trusts deem § 332's non-recognition provision to apply only after realization under § 331, without effect on whether the gain is an "item of income." 26 U.S.C. § 331. The Trusts position is that this realized but unrecognized gain

17

is considered an "item of income" and they are permitted to increase their bases in their Wind River stock.

In contrast, the Commissioner claims the gain must first be "recognized" to qualify as an "item of income," and the gain in this case is not recognized due to § 332's non-recognition provision. Section 332 governs "complete liquidations of *subsidiaries*." *Id.* § 332 (emphasis added). An S Corp. may elect Qsub status for its subsidiary if "(1) the [S Corp.] parent holds 100 percent of the subsidiary's stock, (2) the subsidiary is otherwise eligible to qualify as an [S Corp.] on its own, but for the fact that it has a corporate shareholder, and (3) the [S Corp.] parent makes the appropriate election . . . ." *In re Majestic Star Casino, LLC*, 716 F.3d 736, 743 n.6 (2013) After a Qsub election, for tax purposes, "the subsidiary is deemed to have liquidated into the parent under I.R.C. §§ 332 and 337." 26 C.F.R. § 1.1361-4 (2012). Thus, "[a] Qsub does not even exist for federal tax purposes." *Majestic Star Casino*, 716 F.3d at 759. Section 332 then states "[n]o gain or loss shall be *recognized* on the receipt by a corporation of property distributed in complete liquidation of another corporation." 26 U.S.C. § 332(a) (emphasis added); *see also* § 337(a) ("No gain or loss shall be recognized to the liquidating corporation on the distribution to the 80-percent distributee of any property in a complete liquidation to which section 332 applies.").

18

The Treasury Regulations further distinguish between §§ 331 and 332.[23] "Section 332 applies only to those cases in which the recipient corporation receives at least partial payment for the stock which it owns in the liquidating corporation."[24] 26 C.F.R. § 1.332-2(b).

---

[23] The relevant distinguishing language states:

> Under the general rule prescribed by section 331 for the treatment of distributions in liquidation of a corporation, amounts received by one corporation in complete liquidation of another corporation are treated as in full payment in exchange for stock in such other corporation, and gain or loss from the receipt of such amounts is to be determined as provided in section 1001. Section 332 excepts from the general rule property received, under certain specifically described circumstances, by one corporation as a distribution in complete liquidation of the stock of another corporation and provides for the nonrecognition of gain or loss in those cases which meet the statutory requirements.

26 C.F.R. § 1.332-1.

[24] The regulations further state:

> The nonrecognition of gain or loss is limited to the receipt of such property by a corporation which is the actual owner of stock (in the liquidating corporation) possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 percent of the total number of shares of all other

Ultimately, the Tax Court rejected the Trusts' arguments under § 331, specifically noting that § 332, which governs the liquidation of a subsidiary of which the parent corporation owns eighty percent or more, applies here, not § 331, which governs "all other liquidations." *R. Ball*, 2013 WL 452722, at \*6. The Court held that a liquidation cannot be governed by both § 331 and § 332, thereby foreclosing the Trusts' argument that the gain was first realized under § 331 and then subject to nonrecognition treatment under § 332.

The Tax Court is correct. The Trusts fail to address the fact that § 332, by its plain text, applies to a special set of liquidations that are treated under a different statutory scheme and do not create "items of income." Under the Internal Revenue Code, a Qsub election results in a § 332 liquidation. *See* 26 C.F.R. § 1.1361-4 (providing that a Qsub election is a

classes of stock (except nonvoting stock which is limited and preferred as to dividends). The recipient corporation must have been the owner of the specified amount of such stock on the date of the adoption of the plan of liquidation and have continued so to be at all times until the receipt of the property. If the recipient corporation does not continue qualified with respect to the ownership of stock of the liquidating corporation and if the failure to continue qualified occurs at any time prior to the completion of the transfer of all the property, the provisions for the nonrecognition of gain or loss do not apply to any distribution received under the plan.

26 C.F.R. § 1.332-2(a).

20

deemed liquidation into the parent corporation); 26 U.S.C. § 332 (covering the complete liquidation of a wholly owned subsidiary). Section 332 applies to the liquidation of a "controlled subsidiary" into its parent. Boris I. Bittker & James S. Eustice, *Federal Income Taxation of Corporations & Shareholders* ¶ 10.20 (7th ed. 2006). A Qsub is a wholly owned subsidiary under § 1361(b)(3)(B)(i) ("[one hundred] percent of the stock of such corporation is held by the S corporation.").

The Trusts argue that § 332(d) ("Recognition of gain on liquidation of certain holding companies") provides that "subsection (a) and section 331 shall not apply to such distribution." 26 U.S.C § 332(d)(1)(A). This, according to them, is proof that the sections are not mutually exclusive, because, if they were, there would be no need for the exception. That subsection, however, does not affect the analysis of a Qsub liquidation at issue here. Instead, it focuses on "distribution[s] to foreign corporation in complete liquidation of an applicable holding company." *Id*. It is not incongruous to say that a Qsub liquidation, governed by § 1361, is only covered by § 332 but that other liquidations, covered by other sections of the Code, may be covered by both § 332 and § 331. Rather, the complexities of intersecting provisions should be maintained. The tax treatise cited by both parties states that § 332 is an "important exception" to the general rule provided in § 331. Bittker & Eustice ¶ 10.20. As such, a liquidation is either governed by the general rule in § 331, or it is covered by the exception in § 332. As the Tax Court correctly held, "[a] liquidation cannot be governed by both." *R. Ball*, 2013 WL 452722, at *6.

### C. *Gitlitz* and *Farley*

21

The Trusts contend, however, regardless of "whether or not Sections 331 and 332 are viewed as separate corporate liquidation schemes does not alter the result." (Appellants' Opening Br. at 42.) Rather, the results of *Gitlitz* and *Farley* and the treatment of gains as income under § 61(a) are dispositive.

The Trusts rely on the holdings of *Gitlitz* and *Farley*, allowing a discharge of indebtedness to pass through to shareholders as an "item of income," as justification for their own "items of income" argument.[25] Specifically, the Trusts argue that an "item of income" may be defined as gross income under one provision of the Code, yet not recognized under another provision, and still remain an "item of income" for the purpose of § 1366. In *Gitlitz*, petitioners were shareholders of an insolvent S corporation, which realized over two million dollars of discharge of indebtedness income in 1991. 531 U.S. at 208. Even after the discharge of indebtedness income, the S Corp. was still insolvent and so the entire discharge of indebtedness was excluded from gross income under §§ 108(a) and 108(d)(7)(A). *Id.* at 209-10. On their tax returns, the *Gitlitz* petitioners increased their bases in the S corp.'s stock by their pro rata share of the discharge of indebtedness income under the theory that the discharge of indebtedness income was an "item of income" that was passed through to the taxpayers under § 1366(a)(1)(A). *Id.* at 210. The petitioners in *Gitlitz* then used the increased bases to deduct their total losses. *Id.* The Supreme Court agreed, finding "[that] section [1366] is worded broadly enough to include any item of income, even tax-deferred income, that

---

[25] The Trusts state "[t]his case falls squarely within *Gitlitz* and *Farley*." (Reply Brief at 9.)

'could affect the liability for tax of any shareholder.'" *Id.* at 216 (quoting § 1366(a)(1)(A)).

This Circuit in *Farley* issued a similar, and even more expanded, holding. 202 F.3d at 206.

> We hold that because the controlling statutes clearly provide that tax attribute reduction takes place after income has passed through the S corporation to its shareholders (pass through being a necessary prerequisite to "determin[ing] the tax imposed by this chapter for the taxable year of discharge")*,* in the case of an insolvent S corporation, discharge of indebtedness income that is excluded from gross income by section 108(a), passes through to the shareholders, increases the shareholder's basis in their S corporation stock, thus allowing the shareholders to take deductions for S corporation losses suspended under section 1366(d)(1).

*Id.* The Supreme Court in *Gitlitz* acknowledged that all "items of income" need not qualify as gross income and the indebtedness in *Gitlitz* still was "income" as included under § 61(a)(12). *Id.* at 213. In contrast to *Gitlitz*, a similar inclusion under § 61(a) is not present in the "gain" in the appeal before us. *See Nathel v. Comm'r*, 615 F.3d 83, 91 (2d Cir. 2010) ("The argument ignores the crucial difference between *Gitlitz* and this case: *Gitlitz* addressed payments that explicitly were included in gross income under § 61(a)."). Rather, the "gain" under § 61(a) is not recognized nor is it income, and thus it cannot be an "item of income."

23

The Tax Court noted that any conclusion other than a holding that "unrecognized gain from a Qsub election does not constitute an item of income or tax-exempt income under § 1366(a)(1)(A)," would lead to "absurd results" and "open the door to a myriad of abusive transactions." *R. Ball*, 2013 WL 452722, at *9-10. The Supreme Court in *Gitlitz*, however, refused to address this policy argument when the text of the Code was clear. *Gitlitz*, 531 U.S. at 220 ("Because the Code's plain text permits the taxpayers here to receive these benefits, we need not address this policy concern."). Although statutory text cannot be read in a way that creates an absurdity, the payment of some taxes and not others is not an absurdity, but rather a policy choice rightly left to Congress. *Id.* Indeed, Congress, subsequent to *Gitlitz*, made changes to the statute at issue in that case to prevent further uses of the tax code loophole.[26]

---

[26] *See supra* note 17. "As a general matter, the Committee believes that where, as in the case of the present statute under section 108, the plain text of a provision of the Internal Revenue Code produces an ambiguity, the provision should be read as closing, not maintaining, a loophole that would result in an inappropriate reduction of tax liability." H.R. Rep. No. 107-251, at 52 (2002). Congress provides a further illustration of why the change, similar to issues presented on appeal.

Interconnecting these regulations demonstrates that the gain is not recognized and under the definition of the Supreme Court is not income, and therefore if not income, cannot be deemed an "item of income" under § 1366. In sum, the S Corp. shareholders could not increase their bases under § 1367. The Trusts fail to cite any authority for the alternative.

For the foregoing reasons, we will affirm the Order of the Tax Court.

---

To illustrate these rules, assume that a sole shareholder of an S corporation has zero basis in its stock of the corporation. The S corporation borrows $100 from a third party and loses the entire $100. Because the shareholder has no basis in its stock, the $100 loss is "suspended" at the corporate level. If the $100 debt is forgiven when the corporation is in bankruptcy or is insolvent, the $100 income from the discharge of indebtedness is excluded from income, and the $100 "suspended" loss should be eliminated in order to achieve a tax result that is consistent with the economics of the transactions in that the shareholder has no economic gain or loss from these transactions.

*Id.*