T.C. Memo. 2017-20

UNITED STATES TAX COURT

SCOTT KIMREY GOLDSMITH, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

GOLDSMITH & ASSOCIATES, LTD., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 13335-12, 14342-12.          Filed January 26, 2017.

Scott Kimrey Goldsmith, pro se in docket No. 13335-12.

Scott Kimrey Goldsmith (an officer), for petitioner in docket No. 14342-12.

David L. Zoss, John Schmittdiel, Julie A. Schwoebel, and Jeremy J. Eggerth, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge:  Goldsmith & Associates was a small law firm with a big accounting problem.  Scott Goldsmith was its owner, and his tax troubles

**[*2]** eventually led to prison.  Now we have to sort through the records--the few that exist--to decide several issues from his and his firm's 1999-2002 tax years.

FINDINGS OF FACT

Mr. Goldsmith practiced law for almost 30 years.  He spent the early years of his career working as a litigator for the Minneapolis firm of Rider Bennet.  After fourteen years there he moved to another Minneapolis firm, Popham Haik.  After Popham Haik merged with another firm in 1997, Mr. Goldsmith decided to set out on his own and formed Goldsmith & Associates, Ltd. (G&A), a Minnesota corporation treated as an S corporation for federal tax purposes.[1]  G&A first operated out of Mr. Goldsmith's home, but eventually moved to conventional office space.  Mr. Goldsmith was its sole shareholder and officer, but he had four associates working for him.

A.    G&A's Chaotic Accounting Records

G&A had problems from the start.  Mr. Goldsmith had a clear vision of the type of law he wanted to practice, but he was a self-proclaimed micromanager

---

[1] An S corporation is a corporation governed under the laws of subchapter S of the Internal Revenue Code.  S corporations are not generally subject to Federal income tax but like partnerships are conduits through which income flows to their shareholders.  See Gitlitz v. Commissioner, 531 U.S. 206, 209 (2001) ("Subchapter S allows shareholders of qualified corporations to elect a 'pass-through' taxation system under which income is subjected to only one level of taxation").

**[*3]** without the know-how to manage.  He testified that he had "no personal experience, education or background in accounting or the operation of a business or financial background."  He "micromanaged virtually about everything and * * * did not have the clarity of vision to * * * try to see how things should run."  He did not keep sufficient accounting records, and for the first four months of G&A's existence, he didn't even keep company funds in a corporate account.  He kept track of cashflow and expenses on a legal pad, but the legal pads would pile up.  Chaos ensued, and Mr. Goldsmith hired a CPA to set up a better way to keep books and records.  The investment proved to be a poor one:  The firm's records were entered into software that didn't make them usable to Mr. Goldsmith or his associates.  The CPA was expensive, and the pressure on G&A's cashflow began to build.

The firm did have a fair number of clients, but it mostly worked on contingency.  When a contingent-fee firm has good business, it can pile up costs much more rapidly than offsetting fees.  And that's what began to happen at G&A.  The firm had no credit and was unable to get a loan from a bank.  Without much money coming in, Mr. Goldsmith was forced to fund its operations by taking out mortgages on his personal residence.  During the years at issue he used the proceeds to make at least thirteen advances to G&A.  For each advance he would

**[*4]** draft a contract between G&A and himself that detailed repayment terms and the consequences of a default. Mr. Goldsmith poured money into the business and didn't always pay his personal bills. By late 1999 one of the two mortgages on his residence went into default, and the house entered foreclosure. Mr. Goldsmith credibly testified that he thought he'd hit bottom when he traveled to Florida to represent a client in a difficult race-discrimination case. After more than a week of trial he ended up with a hung jury. He'd used every last penny he had getting to Florida and was stuck at a motel in Tampa with no money to pay the bill or buy an airline ticket home. It took two weeks, but he managed to find someone willing to lend him $2,500 so he could return to Minnesota.

Then his luck turned.

Or at least it seemed to.

B.     The Windfall Contingent Fee

After he struggled to get back home, a massive settlement from an old antitrust case came through. G&A got a fee of $880,000. Mr. Goldsmith took the full amount as a distribution from G&A, wrote a $700,000 check to redeem his personal residence from foreclosure, and put what was left back into the firm. This decreased the firm's debt to him and so reduced his aggregate basis in G&A stock. Within a month, though, G&A was sinking again. By August 2000 it

**[*5]** didn't have enough money to make payroll, and Mr. Goldsmith again began eyeing the newly restored equity in his home.

C.    The End of G&A

Mr. Goldsmith looked for help from a two-person operation that lent money against a borrower's personal credit at higher than average interest rates--*much* higher interest rates.  Legal loan-shark interest rates.  This time G&A took out a 5-year loan for $200,000 with an 18% interest rate.  The loan was guaranteed by Mr. Goldsmith and his wife, who again mortgaged their residence to secure the loan.  Within two months, the money was gone.  In November 2000 G&A borrowed an additional $100,000 at 18%.  Again the note was guaranteed by Mr. Goldsmith and his wife.

That money lasted until March 2001.  When it ran out, G&A borrowed another $50,000.  But this loan was for a term of less than a year and with an interest rate of 5% *per month*.  The next month G&A borrowed another $25,000 under the same terms.  This could not go on, and Mr. Goldsmith was about to learn the truth of the old adage that a synonym of usury is ruin.  Two things happened: By August 2001 the money had run out again, and all but one of G&A's associates left when G&A could not meet payroll.  By January 2002, even the straggler lost hope, and Mr. Goldsmith was left with a workload meant for five attorneys.  Then

[*6] his secretary left and his office lease ended. Unable even to afford professional movers, Mr. Goldsmith packed up his records and eventually moved G&A to the basement of his home. The move did not improve the organization of G&A's records.

Mr. Goldsmith just couldn't keep up with the work. He tried to set his clients up with other attorneys, but it never made a difference. Cashflow dropped to a trickle, and by early 2002 Mr. Goldsmith had defaulted on all four of the high-interest loans. Two creditors foreclosed on his residence, and he and his wife were evicted in May 2002. He and his wife were left with only redemption rights in their home.

In a last effort to save it, he contracted with yet another lender on yet harsher terms. Believing he had equity in his home, Mr. Goldsmith and his wife--not G&A--contracted with Eric Mitchell. Mr. Mitchell promised to use the Goldsmiths' redemption rights to buy the property and according to Mr. Goldsmith gave him a chance to buy it back later in exchange for $300,000 plus the cost of redemption. After the deal closed Mr. Mitchell held title to the property, but he at least gave Mr. Goldsmith and his wife permission to live there. The home was worth about $1.5 million, and Mr. Mitchell redeemed it for $600,000--which according to Mr. Goldsmith meant it would cost almost

[*7] $900,000 to buy it back.[2]  But there was no salvation in this redemption: G&A continued to spiral downward, and Mr. Goldsmith's license to practice law was suspended by the Minnesota Lawyers Board of Professional Responsibility in May 2004.

D.    Criminal Investigation and Imprisonment

In June 2005 Mr. Goldsmith was indicted on twelve counts under section 7202[3] for failing to account for and pay over federal income and FICA taxes withheld from employees for the 1999, 2000, 2001, and 2002 tax years; and four counts under section 7203 for failing to file individual income returns for the 1999, 2000, 2001, and 2002 tax years.  A plea of *nolo contendere* led to a judgment against him for all sixteen counts.  He was sentenced to 33 months of imprisonment followed by three years of supervised release.  See United States v.

---

[2] There's limited documentation on the deal in the record, and we have only Mr. Goldsmith's testimony that he was on the hook for a $300,000 payment. There is no evidence that shows whether and how Mr. Goldsmith bought the property back from Mr. Mitchell.  We have only the lease allowing Mr. Goldsmith and his wife to stay on the property, the real-property option agreement between Mr. Mitchell and the Goldsmiths, and loan documentation between Mr. Mitchell and Associated Bank.  (Mr. Goldsmith admits that these loan documents in evidence do not require *him* to make any payments--they are between Mr. Mitchell and Associated Bank alone.)

[3] All section references are to the Internal Revenue Code in effect for the years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

[*8] <u>Goldsmith</u>, 486 F.3d 404 (8th Cir. 2007), <u>vacated and remanded</u>, 552 U.S. 1089 (2008).

E.    The Audit

After Mr. Goldsmith was released, he had to face a civil audit.  The Commissioner also examined G&A for the same years.  The result was a notice of worker reclassification to G&A that determined Mr. Goldsmith was an employee,[4] and a notice of deficiency to Mr. Goldsmith.

In the notice of deficiency that he sent to Mr. Goldsmith, the Commissioner determined that G&A had had gross receipts of:

| Year | Gross receipts |
|------|----------------|
| 1999 | $278,537 |
| 2000 | 984,645 |
| 2001 | 259,766 |
| 2002 | 147,242 |

and--despite Mr. Goldsmith's lack of good recordkeeping--that G&A was entitled to deduct:

---

[4] Mr. Goldsmith did not address this issue during trial or on brief, and we deem it conceded.  <u>See</u> Rule 34(b)(4), <u>McNeil v. Commissioner</u>, T.C. Memo. 2011-150, 2011 WL 2559802, at *1 n.3, <u>aff'd</u>, 451 F. App'x 622 (8th Cir. 2012).

| [*9] Expense | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| Business expenses | $268,000 | $372,000 | $396,000 | $270,000 |
| Automobile expenses | 2,000 | 4,470 | 3,800 | 1,500 |

As to G&A's financial status, the parties stipulated some numbers, and although those numbers are incomplete, we can find that G&A operated at a loss for the 1999, 2001, and 2002 tax years. The year of the windfall contingent fee, 2000, was the only year G&A made a profit.

The consequences flowed through to Mr. Goldsmith, and the Commissioner determined that for his 1999 through 2002 tax years he had:

| Item | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| Wages | $81, 760 | $91,150 | $83,110 | $100,960 |
| Schedule E income/loss from G&A | (21,695) | 516,455 | (159,442) | --- |
| Standard deduction | (3,600) | (3,675) | (3,800) | (3,925) |
| Exemptions | (2,750) | | (2,900) | (2,820) |
| Non-employee compensation | --- | 2,500 | --- | --- |
| Debt forgiveness | --- | 5,596 | --- | --- |
| Capital gain | --- | 17,829 | 7,000 | 471 |

| [*10] Self employment tax deduction | --- | (34) | --- | --- |
| --- | --- | --- | --- | --- |
| Qualified retirement account income | --- | --- | --- | 4,874 |

The parties settled many of the issues, and we tried the cases in Minnesota, where Mr. Goldsmith was and remains a resident.

OPINION

To properly present an issue for decision, a taxpayer must raise it in his petition and argue it during trial or in his posttrial brief. See Rule 34(b)(4); McNeil v. Commissioner, T.C. Memo. 2011-150, 2011 WL 2559802, at *1 n.3, aff'd, 451 F. App'x 622 (8th Cir. 2012). We deem the many issues that Mr. Goldsmith failed to argue during trial or on brief[5] as conceded. That leaves us with only a handful of issues:

- Whether the alleged closing costs and the alleged $300,000 payment out of the equity in the Goldsmith home to Mitchell are deductible by G&A;

---

[5] In his reply brief, Mr. Goldsmith asserts that he didn't concede any issues, but that in his rush to prepare for trial there was confusion between the parties. He still doesn't *argue* the issues and instead suggests that they be dismissed in his favor. We will not do so.

[*11] •  Whether Mr. Goldsmith is entitled to additional increases in his basis in G&A;

•  Whether he received wages from G&A during the 1999 through 2002 tax years;

•  Whether he had cancellation-of-indebtedness income for the 2000 tax year;

•  Whether he owes additions to tax for failing to timely file and timely pay for 1999, 2000, and 2002.

I.    Closing Costs and Payment to Mitchell

Mr. Goldsmith argues that the closing costs and the $300,000 he says he paid Mr. Mitchell for the deal on his home are expenses that G&A may deduct because the agreement was to G&A's benefit. This seems at first glance unlikely-- the home was the Goldsmiths' personal residence. But his argument is that the payments to Mr. Mitchell were to pay off four separate loans to G&A for a total of $375,000 from two lenders during the 2000 and 2001 tax years. For each loan, Mr. Goldsmith and his wife signed an unconditional guaranty backing G&A's performance. He and his wife secured their guaranties with yet another mortgage on their personal property. When G&A defaulted on those loans, it owed the money to Mr. Goldsmith. He says that by operation of the contracts and Minnesota state law G&A would have been liable upon default to Mr. Goldsmith for his loss *and* the cost of performing his guaranties--a total of about $1.5 million.

**[\*12]** Mr. Goldsmith argues that he *had* to refinance his residence with Mr. Mitchell so that he could get the money to give to G&A so G&A could repay him.

The Commissioner disagrees with this rather convoluted argument and argues more straightforwardly that even if G&A was on the hook to Mr. Goldsmith, there can be no business deduction for G&A for expenses that were personal to Mr. Goldsmith. We agree: The answer here does not rely on the contracts between Mr. Goldsmith and G&A that Mr. Goldsmith analyzes at length under Minnesota law, but rather on the nature of the expense.

A.     Ordinary and Necessary Expenditures of G&A

Section 162(a) allows a taxpayer to deduct expenses paid or incurred during the taxable year in carrying on a trade or business. Section 162(a) requires that the expense be:

- •     paid or incurred during the tax year,

- •     incurred to carry on its trade or business, and

- •     "ordinary" and "necessary" to the business.

See Commissioner v. Lincoln Sav. & Loan Ass'n, 403 U.S. 345, 352 (1971); Dobbe v. Commissioner, T.C. Memo. 2000-330, aff'd, 61 F. App'x 348 (9th Cir. 2003). The key here in deciding whether G&A can deduct Mr. Goldsmith's closing costs and the alleged $300,000 payment to Mr. Mitchell is whether that

[*13] cost was its own "ordinary" and "necessary" expense. See sec. 262(a); Cavanaugh v. Commissioner, T.C. Memo. 2012-324; Dobbe, T.C. Memo. 2000-330. Even if it is true that Mr. Goldsmith's refinancing indirectly benefited G&A, we've consistently found that where a taxpayer's *primary* reason for an expense is personal, the expense is not a deductible business expense. See Rehman v. Commissioner, T.C. Memo. 2013-71; Deihl v. Commissioner, T.C. Memo. 2005-287; see also Dobbe, T.C. Memo. 2000-330.

In Rehman, the taxpayer claimed that the primary purpose of a trip to Las Vegas was for his business, but the evidence showed that the trip was for gambling and other entertainment. No business-expense deduction there. In Dobbe the taxpayers argued that landscaping their personal residence benefited their business (which they ran from their home) by improving its "first impression" on customers. We found that the landscaping did have some incidental benefit to the business, but also found that it primarily benefited the taxpayers personally because it made their home prettier. No business-expense deduction there either.

It's the same here. Mr. Goldsmith's alleged payments to Mr. Mitchell were personal. The agreement between Mr. Mitchell and Mr. Goldsmith was just that--between them and *not* between Mr. Mitchell and G&A. We also specifically

**[\*14]** find that Mr. Goldsmith was quite desperate to stay in his personal residence and not lose all the equity that he and his wife had in it. Even if G&A indirectly benefited from the refinance, we find Mr. Goldsmith's primary purpose for the refinancing of his personal residence was personal. We find for the Commissioner on this issue.

B.    Substantiation

As an alternative holding, we find that even if the refinancing primarily benefited G&A, Mr. Goldsmith did not substantiate the amount of those expenditures. To prove deductions under section 162, a taxpayer must keep sufficient records to substantiate them. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs. We may estimate some types of business expenses, but only if the taxpayer provides at least some documentation to support an estimate and only if we are convinced from the record that he incurred them. Cohan v. Commissioner, 39 F.2d 540, 543-44 (2d Cir. 1930); Blythe v. Commissioner, T.C. Memo. 1999-11. Mr. Goldsmith did not present any evidence other than his testimony that he paid closing costs or $300,000 to Mr. Mitchell in the deal for his residence. See *supra* note 2. We do not find his uncorroborated testimony on this issue credible. And without that, we decline to make a Cohan estimation.

**[*15]** II.      Mr. Goldsmith's Basis in G&A

Sections 1366 through 1368 govern the tax treatment of S corporation shareholders.  Under section 1366, items of an S corporation are generally passed through to the shareholders and are not subject to tax at the corporate level.  Id.; Gleason v. Commissioner, T.C. Memo. 2006-191.  A corporation like G&A that lost so much money might at least produce deductible losses.  But the Code limits flowthrough losses and deductions to the sum of a shareholder's adjusted basis in his stock and the corporation's indebtedness to him.  Sec. 1366(d); Barnes v. Commissioner, T.C. Memo. 2012-80, aff'd, 712 F.3d 581 (D.C. Cir. 2013); Gleason, T.C. Memo. 2006-191.

A shareholder's basis in his S corporation is increased by income passed through to him and decreased by certain distributions, items of loss and deduction, and nondeductible noncapital expenses.  Secs. 1366(a)(1), 1367(a).  Section 1368 dictates the tax treatment of distributions:  If the S corporation does not have earnings and profits in a particular year, any distributions are generally not included in a shareholder's taxable income.  Distributions up to basis are returns of capital, and distributions in excess of basis are taxed as capital gain.  Sec. 1368(b); see Truesdell v. Commissioner, 89 T.C. 1280, 1294-95 (1987); see also D'Errico v. Commissioner, T.C. Memo. 2012-149.

**[\*16]** One can see how these rules work if we use 2000, in which G&A collected the $880,000 contingent fee. G&A had been struggling for quite some time, and was operating at a deficit that year. When G&A distributed the fee to Mr. Goldsmith, G&A's lack of accumulated earnings meant that this amount was not necessarily included in Mr. Goldsmith's taxable income. It might well be a return of capital to the extent of his aggregate basis in G&A's stock. Untangling Mr. Goldsmith's records to calculate his basis in G&A is thus important.

The Commissioner allowed many of Mr. Goldsmith's contributions to G&A to count toward his basis. But Mr. Goldsmith wants more. We will address each year in dispute separately.

1997[6]

For the 1997 tax year the parties stipulated that Mr. Goldsmith made the following payments, contributions, and advances to G&A that increased his basis:

| Item | Amount |
|------|--------|
| Capital stock | $100 |
| Corporate expenses paid by Goldsmith | 17,328 |
| Corporate expenses paid by Goldsmith | 6,112 |

[6] The 1997 tax year was not part of the notice of deficiency, but we look at it because it affects basis computation for the years that were. Sec. 6214(b).

| | |
|---|---|
| **[*17]** Severance payment to Goldsmith contributed to G&A | 73,327 |
| August 4 advance | 30,000 |
| August 15 advance | 15,000 |
| August 21 advance | 20,000 |
| August 28 advance | 12,000 |
| September 30 advance | 4,508 |
| December 15 advance | 13,500 |
| **Total** | **191,875** |

But Mr. Goldsmith says he also made the following additional payments,

contributions and advances:

| Item | Amount |
|---|---|
| Corporate expenses paid by Goldsmith | $17,523 |
| Corporate expenses paid by Goldsmith | 2,197 |
| Personal advance--8/18/1997 | 15,000 |
| Personal advance--8/28/1997 | 12,000 |
| **Total** | **46,720** |

Mr. Goldsmith bears the burden of proving that he paid these additional expenses

or made these additional advances, see, e.g., Kaplan v. Commissioner, T.C. Memo.

2005-218; Blodgett v. Commissioner, T.C. Memo. 2003-212, aff'd, 394 F.3d 1030

(8th Cir. 2005), but we find that he has just duplicated what's already been

stipulated.  The claimed additional expenses are very similar to those already

[*18] allowed by the Commissioner, and the claimed additional advances match two of those already allowed. Mr. Goldsmith claimed during trial that he gave G&A two identical advances on each August date, but he provided a copy of only one check for each date. He also offered his testimony, which we do not find credible without substantiation. Even Mr. Goldsmith himself admits that his "testimony, alone, makes application of the Cohan rule problematic." We find Mr. Goldsmith did not prove an increase in basis during 1997 beyond that already stipulated.

2002

The parties stipulated that Mr. Goldsmith made the following payments, contributions, and advances to G&A that increased his basis in 2002:

| Item | Amount |
|---|---|
| May 2 deposit/advance | $400 |
| August 12 deposit/advance | 22,009 |
| Corporate expenses paid by Goldsmith | 269,934 |
| **Total** | **292,343** |

[*19] Mr. Goldsmith claims he paid an additional $297,710 in corporate expenses. As was the case for 1997, Mr. Goldsmith did not substantiate this claim, and we find he is not entitled to this additional amount.[7]

III.    Attributed Wages

The Commissioner asserts that because Mr. Goldsmith was an employee of G&A (a fact Mr. Goldsmith conceded during trial) payments made from G&A to him during the years at issue are constructive wages, which would make G&A owe more in payroll tax and Mr. Goldsmith owe more in income tax.  Mr. Goldsmith argues that because during those years G&A made no money, it could not have afforded to pay him wages, and any money he took out of G&A was to reimburse him for G&A expenses he himself had paid earlier.

We are very skeptical of the Commissioner's work on this issue.  The employee-tax agent assigned to Mr. Goldsmith's case used statistics from the Minnesota Bureau of Labor to find the average salary of attorneys working in the Twin Cities for the years at issue.  She then looked at G&A's records and determined that because Mr. Goldsmith was billing time, and G&A was paying him, G&A must have been paying him wages.  The first problem here is that the

---

[7] Mr. Goldsmith also asserts that the payments to Mr. Mitchell in 2002 should increase his basis in G&A.  We find that Mr. Goldsmith cannot use payments he can't substantiate to increase his basis in G&A.

[*20] agent did not take into account any loans Mr. Goldsmith made to G&A. We also saw no indication that she considered G&A's operating expenses or whether she even asked herself if she had all the information necessary to make her determination. She admitted that "with [her] experience now, [she] would have taken [expenses and loans] into much more consideration," and that since then she's learned a lot more.

There's no rule that an S corporation *has* to pay its sole shareholder a wage, especially when it's bleeding money the way G&A did. The real question is one of fact--were the payments a return of capital, repayments of loans, or wages? See Scott Singer Installations, Inc., v. Commissioner, T.C. Memo. 2016-161. We look at all the evidence. See Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980). Mr. Goldsmith bears the burden of proving that funds paid to him by G&A were for repayment of loans. See Rule 142(a).

**[\*21]** There's a multiprong test for this,[8] but we stick to the prongs most likely to implicate the facts we have. To guide us, we have the benefit of <u>Scott Singer Installations</u>, which featured some freakishly similar facts. As did Mr. Goldsmith, Mr. Singer raised money for his business from the equity in his home. When he ran out of equity and was unable to continue borrowing from commercial banks, he began borrowing from family members and lending it to his corporation. Mr. Singer may have wanted this to create a debtor-creditor relationship with his corporation, but we held that these infusions of capital would be loans only if Mr. Singer reasonably expected to be repaid. For the years the business was strong, we found Mr. Singer had a reasonable expectation of repayment. But, when business dropped off, and Mr. Singer was forced to seek help from nontraditional lenders, he had no reasonable expectation of repayment.

---

[8] The factors this court considers in such an analysis include: (1) the names given to the documents that would be evidence of the purported loans; (2) the presence or absence of a fixed maturity date; (3) the likely source of repayment; (4) the right to enforce payments; (5) participation in management as a result of the advances; (6) subordination of the purported loans to the loans of the corporation's creditors; (7) the intent of the parties; (8) identity of interest between creditor and stockholder; (9) the ability of the corporation to obtain financing from outside sources; (10) thinness of capital structure in relation to debt; (11) use to which the funds were put; (12) the failure of the corporation to repay; and (13) the risk involved in making the transfers. <u>Calumet Indus., Inc. & Subs. v. Commissioner</u>, 95 T.C. 257, 285 (1990); <u>Dunnegan v. Commissioner</u>, T.C. Memo. 2002-119.

[*22] It's the same here. Mr. Goldsmith sought funding for G&A from usurers because reasonable creditors would not finance the firm. Even during the earlier years when he was able to use equity in his home to fund G&A, the business was running at a deficit. From 1997 through 2002 G&A had only one profitable year--2000, the year of the large contingent fee. Even with that fee, however, G&A was still failing--as shown by the losses in the following years and Mr. Goldsmith's own acknowledgment. For these reasons we find that payments that G&A made to Mr. Goldsmith were not wages, as the Commissioner asserts, and were not reimbursements for expenses as Mr. Goldsmith insists, but rather were a nontaxable return of capital to the extent of his basis.

IV.   Cancellation-of-Indebtedness Income

The Commissioner asserts, based on a third-party information return, that Mr. Goldsmith had $5,596 in cancellation-of indebtedness-income for the 2000 tax year. This is presumptively income, see sec. 61(a)(12), and Mr. Goldsmith bears the burden of showing that his discharge from indebtedness falls within some exception to this general rule, see Rule 142(a). One way to do that is to show that the debt was disputed. McCormick v. Commissioner, T.C. Memo. 2009-239; see Melvin v. Commissioner, T.C. Memo. 2009-199. Mr. Goldsmith did claim at trial that his discharge was the result of a dispute he settled with a

[*23] credit-card company (whose identity he was not quite sure of), but he was unable to produce any documentation to prove that--despite his insistence during trial that he'd received letters describing the dispute. We did not find his uncorroborated testimony credible, and thus we find for the Commissioner on this issue.

V.    Additions to Tax

The Commissioner determined additions to tax under section 6651(a)(1) and (2) for the 1999, 2000, and 2002 tax years.

Section 6651(a)(1) imposes an addition to tax for failing to timely file a tax return. Mr. Goldsmith didn't file any tax returns for the 1999-2002 tax years, and he's offered no evidence[9] that the failure to timely file was due to reasonable cause and not willful neglect. We therefore find for the Commissioner on this issue.

Section 6651(a)(2) imposes an addition to tax for failing to timely pay tax shown on a return. No one disputed that the Commissioner prepared adequate substitutes for returns under section 6020(b)(2). This triggered section 6651(a)(2).

---

[9] Mr. Goldsmith did testify that he was clinically depressed during the years at issue, but was able to otherwise function and represent between 15-30 clients per month. Even if he had argued his mental illness gave him reasonable cause, a taxpayer must show that his mental or emotional disorder "rendered [him] incapable of exercising ordinary business care and prudence during the period in which the failure to file continued." Wilkinson v. Commissioner, T.C. Memo. 1997-410, 1997 WL 570863, at *7. Mr. Goldsmith couldn't do this.

**[*24]** <u>See</u> sec. 6651(g).  Mr. Goldsmith has likewise not offered any evidence that his failure to timely pay his tax was due to reasonable cause, and so we sustain the addition to tax under section 6651(a)(2).

<u>Decisions will be entered under</u>

<u>Rule 155</u>.